UNITED STATES of America,
Plaintiff-Appellee,

v.

Roberto AYO–GONZALEZ,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

CUBAN VESSEL F–V E–82HB, her
engines, etc., in rem., et al.,
Defendants-Appellants.

Nos. 75–3297 and 75–3873.

United States Court of Appeals,
Fifth Circuit.

Aug. 6, 1976.

Michael Krinsky, Eric Lieberman, New York City, G. Rudolph Garza, Jr., Corpus Christi, Tex. (Court-appointed), for defendants-appellants.

Edward B. McDonough, Jr., U.S. Atty., Jack Shepherd and James R. Gough, Asst. U.S. Attys., Houston, Tex., Peter R. Taft, Asst. Atty. Gen., Bruce C. Rashkow, Ralph J. Gillis, U.S. Dept. of Justice, Washington, D.C., Robert Darden, Asst. U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before GEWIN, GODBOLD and SIMPSON, Circuit Judges.

GEWIN, Circuit Judge:

These consolidated cases present for our review the conviction of Roberto Ayo-Gonzalez, as master of the Cuban fishing vessel E–82HB, for illegally fishing in the contiguous fishing zone of the United States; and the judgment of forfeiture awarded the United States on a libel *in rem* charging the

vessel with the same illegal act,[1] in violation of 16 U.S.C. §§ 1081, 1082, 1091, 1092.

Section 1081 provides in pertinent part:

It is unlawful for any vessel, except a vessel of the United States, or for any master or other person in charge of such a vessel, to engage in the fisheries within the territorial waters of the United States . . . or within any waters in which the United States has the same rights in respect to fisheries as it has in its territorial waters . . . .

By sections 1091 and 1092, the United States established a fishing zone nine nautical miles in breadth, contiguous to the traditional three-mile territorial sea, in which zone it asserts "the same exclusive rights" to fishing as in the territorial sea.[2] Section 1082 establishes penalties for violations.[3]

In the district court, Ayo waived trial by jury, and the criminal and *in rem* actions were consolidated for a bench trial. The judge overruled a defense suppression motion based on alleged violation of *Miranda*[4] rights, and rejected the contention that some form of mens rea[5] must be proved to sustain a conviction. He ordered the vessel forfeited and found defendant Ayo guilty, sentencing him to one year unsupervised probation, with the conditions that during his probation Ayo not engage in commercial fishing and that he not enter the territorial limits of the United States. Before this court, appellant Ayo contends that the trial court committed reversible error in denying his suppression motion. It is argued on behalf of both Ayo and the vessel that mens rea is required to establish liability, or, if not, that section 1081 is unconstitutional. We affirm.

I

In the pre-dawn hours of August 2, 1975, crewmen aboard the United States Coast Guard Cutter *Point Baker*, which was on fisheries patrol out of Port Aransas, Texas, sighted the Cuban vessel E–82HB, an 82-foot shrimp trawler, fishing within the twelve-mile limit. Special Agent Velasco of the National Marine Fishery Service, who was on the *Point Baker*, directed the officer in charge to attempt to stop the Cuban vessel by using the cutter's flashing blue light, spotlight, and siren, and finally by cutting in front of her, but the vessel continued to trawl. Velasco then obtained a loud hailer and informed the Cubans in Spanish that they were fishing in United States waters in violation of the law and that they must stop engines and drop anchor. Still the vessel continued trawling, so Velasco repeated the above warning a second and a third time, whereupon a man appeared at the side of the Cuban boat and called out that he could not stop because his fishing gear was in the water. After the

---

1. Flora Camaronera del Caribe, an instrumentality of the Republic of Cuba, entered a limited appearance in the district court as claimant to the vessel.

2. § 1091. Establishment; fisheries rights:

There is established a fisheries zone contiguous to the territorial sea of the United States. The United States will exercise the same exclusive rights in respect to fisheries in the zone as it has in its territorial sea, subject to the continuation of traditional fishing by foreign states within this zone as may be recognized by the United States.

§ 1092. Description of boundaries:

The fisheries zone has as its inner boundary the outer limits of the territorial sea and as its seaward boundary a line drawn so that each point on the line is none nautical miles from the nearest point in the inner boundary.

3. Section 1082 provides in pertinent part:

(a) Any person violating the provisions of this chapter shall be fined not more than $100,000, or imprisoned not more than one year, or both.

(b) Every vessel employed in any manner in connection with a violation of this chapter including its tackle, apparel, furniture, appurtenances, cargo, and stores shall be subject to forfeiture and all fish taken or retained in violation of this chapter or the monetary value thereof shall be forfeited. For the purposes of this chapter, it shall be a rebuttable presumption that all fish found aboard a vessel seized in connection with such violation of this chapter were taken or retained in violation of this chapter.

4. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

5. The term "mens rea" is used in this opinion to refer to any degree of culpability, including negligence.

gear was pulled in, the vessel dropped anchor.

An attempt was made to board the Cuban vessel by jumping from the bow of the *Point Baker* to the stern of the E–82. At this point, defendant Ayo appeared at the rail of the Cuban vessel and requested that agent Velasco speak to his flotilla commander. Velasco told Ayo that the cutter did not have the necessary frequency, and that if Velasco were to talk to the flotilla commander, he would have to use Ayo's radio; Ayo indicated that that would be acceptable. Velasco then asked Ayo if he was the captain, and Ayo answered affirmatively.[6]

Because of rough seas, this method of boarding proved too dangerous, so a small boat was launched from the *Point Baker* with a boarding party of four, and the Cuban boat was boarded at 7:00 a. m. The crew was already gathered at the stern of the trawler, and Velasco said to them, in Spanish, "I want to speak to your captain," at which point Ayo stepped forward and said he was the captain; two crew members nodded in agreement. When Velasco asked Ayo for identification, he explained that he usually served as captain of a different vessel; he had been transferred to the E–82 at sea, and had left his identification on the other ship.

Velasco and Ayo proceeded to the pilot house, where Velasco again identified himself and the boarding party, and read Ayo his *Miranda* rights. Ayo said that he understood his rights and wanted to speak. He told Velasco that he had very poor navigational equipment, and that he depended for navigation on a larger boat, which had radar; the E–82 had no radar, but it did have a chronometer, fathometer, sextant, compass, tables, and charts. Velasco examined Ayo's navigational aids, and then allowed Ayo to radio his flotilla commander. The commander requested that Velasco speak with him to try to reconcile the situation, but Velasco declined.

At the trial, Ayo testified that he had followed his "mother ship," which had radar, until about 1:00 a. m. on August 2, and then had separated from her and followed a course that he thought would keep him beyond the twelve-mile limit; he stated that he knew it was illegal to fish within twelve miles of the coastline. When Ayo radioed the mother ship after the boarding, he was informed that his position was 14.2 miles from the coast.[7]

The position of the Cuban vessel was checked through numerous fixes taken by the *Point Baker*'s navigator. In addition, a Coast Guard aircraft confirmed the position. All checks indicated that the vessel was approximately eight miles from St. Joseph Island on the Texas coast. In addition to the catch of marine life in the trawl nets, which were pulled in just before the boat dropped anchor, the boarding party found seven baskets of headed shrimp on board.

## II

For purposes of a section 1082(a) criminal prosecution, there are four elements of the offense created by section 1081: (1) that the defendant be the "master or other person in charge of" (2) a foreign vessel; and (3) that the vessel be "engag[ing] in the fisheries" (4) within the territorial waters of the United States or the nine-mile contiguous fisheries zone.[8] At the consolidated trial below, it was undisputed that the Cuban boat was a foreign vessel and that it was fishing, and the location of the vessel within the twelve-mile limit, although contested, was clearly established by the prosecution. As to the remaining element, the identity of Ayo as the

---

**6.** Velasco's testimony on this point is set out in footnote 10, *infra*.

**7.** There was some indication in the testimony that the mother ship's radar might not have picked up St. Joseph Island, which could have led to the belief that the E–82's position was outside the twelve-mile limit. In fact, although she was some fourteen miles from the mainland, she was approximately eight miles off St. Joseph Island, and thus within the contiguous zone.

**8.** Whether some degree of culpability is a fifth element is discussed in part III, *infra*.

"master," appellant contends that this was proved only by means of a statement obtained in violation of Ayo's *Miranda* rights.

Velasco testified that after the ship was boarded, he addressed the assembled crewmen, of whom there were nine, and stated that he wanted to speak to the captain. In response, Ayo stepped forward, two of the crew members nodded in agreement, and Ayo then affirmed verbally that he was the captain. Concededly, Velasco did not read the *Miranda* warnings to all of the crew before asking for the captain. Therefore, appellant argues, this evidence was impermissibly obtained and may not be considered on the question of identity. It is asserted that without this testimony, the government failed to prove an essential element. The argument is that the first statement by Ayo that he was the captain, made at the time of the unsuccessful boarding attempt, was not sufficiently trustworthy in and of itself, and that any incriminating actions or statements made by Ayo after receiving his *Miranda* rights were fatally tainted by the impermissibly obtained admission. We disagree.

Obviously, this case does not present the typical *Miranda* situation. Under ordinary circumstances, no *Miranda* question would arise concerning the propriety of an investigating officer establishing the identity of a suspect. The distinguishing factor here, of course, is that the identity of the defendant as master of the offending vessel is itself an essential element of the crime. Were we to find a *Miranda* violation here, the inevitable result would be that the Coast Guard (or other appropriate law enforcement agency) would be required, upon stopping a foreign vessel suspected of violating section 1081, to assemble all those on board the ship, read to them the *Miranda* warnings, and determine that all understand their rights, before attempting to ascertain who is in charge of the vessel. Perhaps it may be argued that such a result is dictated by the rationale of *Miranda* and subsequent cases. On the other hand, in charting a course designed to reflect constitutional policy, the courts are well-advised to accord due regard to the twin moorings of common sense and realism. *Cf. United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684, 689 (1965).

We have determined that a resolution of this particular point is unnecessary on the facts of this case. In a recent decision of this Circuit, Chief Judge Brown examined "[t]he distinction between the genus of unlawful confessions and the species of involuntary or coerced unlawful confessions . . . ." *Smith v. Estelle*, 527 F.2d 430, 431 (5th Cir. 1976) (on petition for rehearing and rehearing en banc). He noted, with exhaustive citation of authority, "the principle that confessions—unlawful but not involuntary—admitted into evidence but obtained without having given the warnings required by *Miranda* are subject to the harmless error rule." *Id.* at 432; *accord, Null v. Wainwright*, 508 F.2d 340 (5th Cir.), *cert. denied*, 420 U.S. 970, 95 S.Ct. 1964, 44 L.Ed.2d 459 (1975). Our careful review of the record herein, including a reading of the entire trial transcript, convinces us that, even assuming *arguendo* that the challenged testimony was erroneously admitted, the error was harmless beyond a reasonable doubt.[9] Agent Velasco had already identified Ayo as the captain, prior to the boarding of the trawler, by virtue of their conversation at the time of the initial, unsuccessful boarding attempt.[10] After his

---

**9.** *See Null v. Wainwright, supra* at 343:

If, upon its reading of the trial record, the appellate court is firmly convinced that the evidence of petitioner's guilt was overwhelming and that the trier of fact would have reached the same result without the tainted evidence, the conviction will stand.

**10.** Velasco's testimony was as follows:

Q [by defense counsel] Before speaking to the assemblage you had not spotted him out in your mind as the defendant—as the captain, rather?

A He had already admitted to me being captain before we ever boarded, yes, sir.

Q Before you boarded the ship?

A Yes.

Q When was that?

A That was whenever we were attempting to board from the *Point Baker* and after

rights were explained to him, Ayo immediately waived them and was, in fact, eager to cooperate in an attempt to rectify the situation. He explained to Velasco his navigational problems, and several times requested that Velasco speak with the flotilla commander. On Velasco's request, Ayo took the agent to his cabin, which bore the designation "Captain" over the door, and showed him his log books and charts. It is appropriate to note that this case was tried by the court sitting without a jury and, as we said in a recent case involving the same question, "[s]trict evidentiary rules of admissibility are generally relaxed in bench trials, as appellate courts assume that trial judges rely upon properly admitted and relevant evidence." *Null v. Wainwright, supra* at 344. Viewing all the facts and cir-

> we had a slight collision with him, we were backing away, and he wanted me to raise his flotilla commander on the 2670 frequency, and I told him that I couldn't because we didn't have that frequency; it wasn't within our capabilities to tune it in. And as we were backing away I told him that if I were to talk to his flotilla commander, I would have to use his radio. And he said, fine. And I asked him, are you the captain? Am I talking to the captain? And he said, yes, I'm the captain.
>
> \* \* \* \* \* \*
>
> Q Now, did you have any doubts about whether he was the captain from that discussion?
> A No, sir.

Appellant contends that subsequent questioning demonstrated that Velasco did doubt the first identification. Read in context, however, it is our conclusion that the later identification, subsequent to the boarding, was essentially a pro forma, procedural matter. The transcript continues:

> Q If you knew he was the captain, why was it necessary for you to ask for the captain to step forward?
> A Because I didn't want any mistake to be made that he might not have been the captain. I wanted to be absolutely positive that he was the captain.
> Q So the purpose of your asking that was to make sure he was the captain?
> A That's correct.
> Q Because you thought it was necessary, for a criminal action, for you to be positive that he was the captain?
>
> \* \* \* \* \* \*

cumstances, we cannot conclude that the admission of Velasco's testimony concerning Ayo's pre-warning identification of himself was reversible error.

## III

Appellants' further contend that the court below erred in refusing to consider any form of culpability, including negligence, as an element of a section 1081 offense.[11] They argue that the substantial penalties prescribed; the resemblance of the offense to the ancient crimes of criminal trespass and poaching, which historically required mens rea; and the statute's legislative history all indicate that Congress intended the statute's ambit, at its broadest, to reach negligent conduct, but not innocent encroachments. If the statute

> A As I understand it, I had to make sure that he was the captain so that we could go about the procedures in establishing the violation and the seizure. To speak with the crew member, just, it wouldn't have been according to procedures, standard procedures.
> Q You had a doubt that he was the captain at the time that you boarded the ship? Is that correct?
> A I had already asked him at one time if he was the captain and he said yes.
> Q And you had a doubt and you wanted further proof? Is that correct?
> A That's right. I wanted to see his captain's papers.

11. The court concluded that the statute was essentially regulatory, see *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), and that no form of intent need be proved to establish a violation. During arguments by counsel at the close of the case the court stated:

> I don't think we get to that reasonableness. I don't think we get to that reasonably prudent man test in this statute.
>
> \* \* \* \* \* \*
>
> I just believe the government proved beyond a reasonable doubt that this ship, at the time it was apprehended by the Coast Guard, was somewhere in the neighborhood of eight miles from the nearest point of shore, which would bring it in violation of this statute.
>
> And that is what I will find, and I so find the defendant guilty because he is the master. The statute says a master.
>
> And I find that the government has met its burden relative to the in rem proceeding on the vessel.

does not require at least negligent conduct, it is argued, then it is unconstitutional as violative of due process.

The construction of section 1081 is a question of first impression in this Circuit, and in fact, it appears that this issue has not been addressed in any reported decision. In examining these contentions, we take as our starting point the familiar precept that "[t]he existence of a mens rea is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." *Dennis v. United States*, 341 U.S. 494, 500, 71 S.Ct. 857, 862, 95 L.Ed. 1137, 1147 (1951). *Accord, Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952); [12] *see Smith v. California*, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959); *Lambert v. California*, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957). But an equally well-established principle, although of more recent vintage, is that "[t]he constitutional requirement of due process is not violated merely because mens rea is not a required element of a prescribed crime." *United States v. Greenbaum*, 138 F.2d 437, 438 (3d Cir. 1943); *e. g., United States v. Freed*, 401 U.S. 601, 607–10, 91 S.Ct. 1112, 1117–1119, 28 L.Ed.2d 356, 361–63 (1971); *Williams v. North Carolina*, 325 U.S. 226, 238, 65 S.Ct. 1092, 1099, 89 L.Ed. 1577, 1586 (1945); *United States v. Balint*, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922); *Shevlin-Carpenter Co. v. Minnesota*, 218 U.S. 57, 30 S.Ct. 663, 54 L.Ed. 930 (1910); *see Morissette v. United States, supra*. As Mr. Justice Douglas stated in *Lambert, supra*, "We do not go with Blackstone in saying that 'a vicious will' is necessary to constitute a crime, . . . for conduct alone without regard to the intent of the doer is often sufficient. There is wide latitude in the lawmakers to declare an offense and to exclude elements of knowledge and diligence from its definition." 355 U.S. at 228, 78 S.Ct. at 242, 2 L.Ed.2d at 231.

While the latitude is broad, it is not, of course, unlimited. When confronted with a challenge to a statute such as section 1081, which on its face appears to impose strict or absolute liability, the courts can turn to no precise and easily applied formula for a solution; many factors must go into the crucible. The Supreme Court in *Morissette* examined the historical background and development of a category of crimes that "depend on no mental element but consist only of forbidden acts or omissions"; these crimes have "very different antecedents and origins" from those offenses that were taken over from the common law. 342 U.S. at 252–53, 72 S.Ct. at 244, 96 L.Ed. at 295. They are frequently referred to as regulatory or public welfare offenses, [13] and their number has steadily expanded over the years. [14] The Court discerned certain characteristics common to this class of offenses:

---

**12.** As Justice Jackson eloquently stated in *Morissette*:

> The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. A relation between some mental element and punishment for a harmful act is almost as instinctive as the child's familiar exculpatory "But I didn't mean to," and has afforded the rational basis for a tardy and unfinished substitution of deterrence and reformation in place of retaliation and vengeance as the motivation for public prosecution.

342 U.S. at 250–51, 72 S.Ct. at 243, 96 L.Ed. at 293–94 (footnotes omitted).

**13.** In *United States v. Dotterweich*, 320 U.S. 277, 280–81, 64 S.Ct. 134, 136, 88 L.Ed. 48, 51 (1943), the Court spoke of

> a now familiar type of legislation whereby penalties serve as effective means of regulation. Such legislation dispenses with the conventional requirement for criminal conduct—awareness of some wrongdoing. In the interest of the larger good it puts the burden of acting at hazard upon a person otherwise innocent but standing in responsible relation to a public danger.

And in *United States v. Balint*, 258 U.S. 250, 252, 42 S.Ct. 301, 302, 66 L.Ed. 604, 605 (1922), it said, "Many instances of this are to be found in regulatory measures in the exercise of what is called the police power where the emphasis of the statute is evidently upon achievement of some social betterment rather than the punishment of the crimes . . . . . ."

**14.** *See United States v. Freed*, 401 U.S. 601,

Many of these offenses are not in the nature of positive aggressions or invasions, with which the common law so often dealt, but are in the nature of neglect where the law requires care, or inaction where it imposes a duty. Many violations of such regulations result in no direct or immediate injury to person or property but merely create the danger or probability of it which the law seeks to minimize. While such offenses do not threaten the security of the state in the manner of treason, they may be regarded as offenses against its authority, for their occurrence impairs the efficiency of controls deemed essential to the social order as presently constituted. In this respect, whatever the intent of the violator, the injury is the same, and the consequences are injurious or not according to fortuity. Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element. The accused, if he does not will the violation, usually is in a position to prevent it with no more care than society might reasonably expect and no more exertion than it might reasonably exact from one who assumed his responsibilities. Also, penalties commonly are relatively small, and conviction does no grave damage to the offender's reputation. Under such considerations, courts have turned to construing statutes and regulations which make no mention of intent as dispensing with it and holding that the guilty act alone makes out the crime.

*Id.* at 255–56, 72 S.Ct. at 246, 96 L.Ed. at 296–97. *Morissette* teaches, however, that mere silence on the part of the drafters is not dispositive on the issue of whether some mental element is required. "Congressional silence as to mental elements in an Act merely adopting into federal statutory law

a concept of crime already . . . well defined in common law and statutory interpretation . . . may warrant quite contrary inferences than the same silence in creating an offense new to general law, for whose definition the courts have no guidance except the Act." *Id.* at 262, 72 S.Ct. at 249, 96 L.Ed. at 299.

The question, then, is primarily one of legislative intent, but the result must comport with fundamental constitutional standards. In *Holdridge v. United States*, 282 F.2d 302, 310 (8th Cir. 1960), Judge, now Justice, Blackmun formulated a comprehensive statement of relevant criteria that, while not a touchstone of constitutionality, is a helpful guide to resolution of the issues before us:

> [W]here a federal criminal statute omits mention of intent and where it seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where conviction does not gravely besmirch, where the statutory crime is not one taken over from the common law, and where congressional purpose is supporting, the statute can be construed as one not requiring criminal intent. The elimination of this element is then not violative of the due process clause.[15]

In applying the foregoing principles, we examine first the legislative history of the Bartlett Act.[16] Prior to the passage of section 1081 in 1964, there were no penalties for fishing by foreign vessels in United States territorial waters, i. e., within three miles from shore; the only recourse available was for the Coast Guard to escort offenders to the high seas. Congress found that situation unacceptable, especially in view of a dramatic increase in the number

607, 91 S.Ct. 1112, 1117, 28 L.Ed.2d 356 (1971): "The presence of a 'vicious will' or mens rea . . . was long a requirement of criminal responsibility. But the list of exceptions grew, especially in the expanding regulatory area involving activities affecting public health, safety, and welfare."

15. This articulation of the governing distinctions was approved by Mr. Justice Brennan, concurring in *United States v. Freed*, 401 U.S. 601, 613 n. 4, 91 S.Ct. 1112, 1120, 28 L.Ed.2d 356, 365 n. 4 (1971).

16. We employ this designation for sections 1081–94 of Title 16.

and sophistication of foreign fishing fleets operating off the United States coast and the frequency of violations of our territorial waters:[17] "Obviously, the limited scope of existing law fails to serve as a deterrent to *innocent or willful* encroachments in our territorial waters, thereby passively permitting foreign vessels to fill their vessels with fishery resources and in so doing deprive U.S. fishermen of the catch." House Comm. on Merchant Marine and Fisheries, H.R.Rep.No.1356, 88th Cong., 2d Sess. (1964), reprinted in 1964 U.S.Code Cong. & Admin.News, pp. 2183, 2184 (emphasis added). The committee also noted the national security implications of the problem, caused by the U.S.S.R.'s maintenance of "at least one trawler designed for intelligence collection off the east coast of the United States on a continuous basis." *Id.* at 2186.

As originally enacted, the maximum fine that could be imposed for a violation was $10,000. In 1970, Congress strengthened the penalties by, inter alia, increasing the maximum fine to $100,000. The Senate Commerce Committee, reporting on the amendment, found that existing law, even with the addition in 1966 of the nine-mile contiguous zone,[18] was insufficient:

> Despite the additional protection afforded these resources, fishing by foreign vessels off our coastal waters continued to increase. . . .
>
> There is growing concern that valuable species of fish and marine life inhabiting the 12-mile zone off our shores are in danger of being seriously depleted, if not becoming extinct, owing to techniques employed by foreign fleets illegally fishing in such areas. . . . It . . . is apparent that the present law is an inadequate deterrent because of a lack of effective sanctions and enforcement or both. The risk of prosecution under existing law would seem to be more than offset by the potential remuneration to be gained from such illegal fishing activity.

Senate Comm. on Commerce, S.Rep.No.91–1320, 91st Cong., 2d Sess. (1970), reprinted in 1970 U.S.Code Cong. & Admin.News, pp. 4660, 4662–63.[19] The Committee also expressed "dissatisfaction with the level of the fines and penalties that have been imposed . . . ." *Id.* at 4663. To meet these problems, it recommended, among other measures, increasing the maximum fine to $100,000. It rejected, however, a proposal that would have set a mandatory minimum fine of $25,000. The Committee concurred in the view of the Departments of State and the Interior, which "expressed great concern over that part of the provision that provides for a mandatory fine. They contended that such a provision failed to take into consideration borderline violations, where the violator may be barely inside the fishery zone, or *unintentional violations* which may be caused by minor errors in navigation." *Id.* at 4664 (emphasis

---

**17.** The House Committee Report quoted the testimony of Senator Bartlett of Alaska, who stated that during 1963, "there were over 200 large, modern foreign fishing vessels off our Atlantic coast, while at the same time approximately 300 foreign vessels were in Alaskan waters, . . . operating along the coast at times within 15 miles or less of the mainland. Not infrequently, foreign fishing vessels strayed within our territorial waters." House Comm. on Merchant Marine and Fisheries, H.R.Rep.No.1356, 88th Cong., 2d Sess. (1964), reprinted in 1964 U.S.Code Cong. & Admin. News, pp. 2183, 2185. The Senator testified further that in the eight months preceding February, 1964, "16 foreign vessels have been officially sighted by the U.S. Navy or Coast Guard in territorial waters within our 3-mile limit off Alaska. My guess is that there have been numerous unreported instances also." *Id.*

**18.** 16 U.S.C. §§ 1091–92.

**19.** The Committee noted:

> As an example of this increasing pressure, the Bureau of Commercial Fisheries reported that the month of August 1969 alone, a total of 325 foreign fishing vessels were observed off the coast of New England. These included vessels belonging to the Soviet Union, Poland, East Germany, Rumania, Bulgaria, Israel, Iceland, Spain, and Norway.

Senate Comm. on Commerce, S.Rep.No.91–1320, 91st Cong., 2d Sess. (1970), reprinted in 1970 U.S.Code Cong. & Admin.News, pp. 4660, 4662. Compare these figures with those related in note 17, *supra.*

added). The Department of Transportation expressed much the same sentiment. *Id.* at 4670. Thus, it was apparently the view of everyone concerned that unintentional and intentional violators were equally liable under the law, and that a mandatory minimum penalty provision would unwisely eliminate the flexibility in sentencing that otherwise could be used to reflect the relative culpability of the offender.[20]

The Committee also addressed itself to a proposal—now a part of section 1082(b)—to establish a rebuttable presumption that all fish found on board an offending vessel were acquired in violation of the Act. The Department of Justice had expressed some reservations concerning the factual basis for such a presumption. In response, the Committee noted that, "since commercial fishing vessels today are equipped with modern navigating equipment, the operators of the vessels know perfectly well where they are at all times, making it *most unlikely* that, with a legal catch on board, they would intrude in our zone by inadvertence." *Id.* at 4665 (emphasis added).

From the foregoing recount of the legislative history several points may be drawn. First, the Act is based on strong policy considerations; Congress sought to preserve the marine resources in our coastal waters, not only so that American fishermen might harvest them, but also to protect against what it saw as the real danger of serious depletion or even extinction of those resources by increasingly large and sophisticated foreign fishing armadas. Second, the lawmakers clearly thought it highly unlikely that purely innocent violations would occur. Third, Congress was most concerned that the Act be "effectively and strictly enforced," *id.* at 4664, but it also desired to make available a wide range of punishments so that the sentences imposed could both serve as an effective deterrent and reflect any mitigating circumstances. Finally, while an intent to impose absolute liability does not *conclusively* appear, there is persuasive evidence to that effect, and we find no persuasive indications in the legislative history of an intent to require some form of mens rea. Moreover, it is appropriate to note that prosecutions under section 1081 would be extremely difficult if the government had to prove willfulness or even negligence.[21] Balanced against Congress's obvious concern and desire for strict enforcement, this is a factor to consider.

The standard imposed by section 1081 is beyond doubt a reasonable one; adherence thereto occasions no undue burden. In this day of inter-planetary travel, some 250 years after invention of the sextant, it can hardly be labeled unreasonable to expect

---

**20.** Also noteworthy are the views of the Commandant of the Coast Guard, which bears the primary enforcement responsibility, who listed some of the relevant considerations in determining whether a particular offending vessel will be seized: "Among the factors which guide the exercise of discretion in pursuing a particular case are these: (1) was the offense intentional; . . . .." Letter from Adm. Chester R. Bender to Rep. Thomas M. Pelly, *quoted in* Fidell, Ten Years under the Bartlett Act: A Status Report on the Prohibition on Foreign Fishing, 54 Boston U.L.Rev. 703, 735 (1974).

**21.** One commentator who made a comprehensive study of the Act and the history of its enforcement concluded that it was designed to reach innocent as well as willful violations. He also noted that "only rarely has there been evidence to suggest that a particular violation was in fact intentional. If enforcement of the Act is to be feasible, a showing that a violation was deliberate cannot be required. Lack of intent is, however, an appropriate considera-

tion in deciding whether to prosecute and in recommending a disposition." Fidell, Ten Years under the Bartlett Act: A Status Report on the Prohibition on Foreign Fishing, 54 Boston U.L.Rev. 703, 736–37 (1974) (footnotes omitted).

The author relates some instances of apparently innocent violations. In one case involving a Bulgarian vessel, the captain, who was prosecuted and fined $20,000, was asleep in his cabin when the violation occurred. *Id.* at 735 n. 178. In another, a Soviet vessel was allowed to depart without seizure because its navigational charts failed to disclose American-owned rocks from which the zone is measured. *Id.* at 737 n. 190. Another Soviet ship was not so fortunate. Its navigational gear erroneously led the captain to believe he was fishing lawfully; this apparently was taken into account in assessing the penalty, which, nonetheless, was substantial: a civil settlement for $225,000 and a $25,000 fine against the master. *Id.*

and require a ship's captain to know where he is, and there is no question concerning the propriety of forbidding foreign vessels from fishing within twelve miles of our shores.

The penalties specified in section 1082, while not insubstantial, are not so great as to indicate that Congress must have intended that some mens rea be an element of the offense. Appellant urges the proposition that no statute carrying a sanction of up to one year imprisonment could constitutionally rest upon a strict liability theory. The decisions upholding statutes with one or more strict liability elements and having potential penalties equal to or greater than section 1082 amply refute that contention.[22] Nor can we accept appellant's argument that "the nature of the offense invites moral stigma." A conviction for fishing within twelve miles of the United States simply will not "gravely besmirch," *Holdridge, supra* at 310, or do "grave damage to an offender's reputation," *Morissette, supra* 342 U.S. at 256, 72 S.Ct. at 246, 96 L.Ed. at 297.

 Appellant asserts that the crime created by section 1081 is essentially one "taken over from the common law," *Holdridge, supra* at 310, because of its purported similarity to the common-law crimes of criminal trespass and poaching. We find this argument unpersuasive. The act of fishing is not inherently illegal, nor has the fact of a foreign ship's presence within a certain distance of our coast ever been viewed as wrong in itself. Prior to 1964, in fact, there was some doubt that it was illegal for a foreign ship to be both present within our territorial waters and engaging in fishing. *See* House Comm. on Merchant Marine and Fisheries, H.R.Rep.No.1356, 88th Cong., 2d Sess. (1964), reprinted in 1964 U.S.Code Cong. & Admin.News, p. 2183. The statute is not based on any common-law offense,

but is a regulatory measure designed to protect both our commercial fishing industry and our marine wildlife; it is typical malum prohibitum offense. *See Pena-Cabanillas v. United States,* 394 F.2d 785 (9th Cir. 1968).

Finally, appellant argues that the Supreme Court's recent decision in *United States v. Park,* 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975), supports his contention that culpability in the form of negligence is a minimum constitutional requirement before criminal liability can attach. In *Park,* the Court addressed the standard of liability of corporate officers under section 301 of the Food, Drug, and Cosmetic Act, 21 U.S.C. § 331, as construed in *United States v. Dotterweich,* 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943). *Dotterweich* held that corporate officials, as well as a corporation itself, could be prosecuted under the Act. The Court concluded that an individual could be found guilty even "though consciousness of wrongdoing be totally wanting." *Id.* at 284, 64 S.Ct. at 138, 88 L.Ed. at 53. The Court was aware of concern that the Act "might operate too harshly by sweeping within its condemnation any person however remotely entangled in the [offense]." *Id.* It concluded that "[t]he offense is committed . . . by all who . . . have . . . a responsible share in the furtherance of the transaction which the statute outlaws . . . ." *Id.*

In the *Park* case, the Court of Appeals reversed a conviction under the Act, in part on the ground that due process required proof of some type of wrongful act of commission or omission as an element of the offense, and the trial judge's instructions "might well have left the jury with the erroneous impression that Park could be found guilty in the absence of 'wrongful action' on his part." *United States v. Park,* 499 F.2d 839, 841–42 (4th Cir. 1974).

---

**22.** *E. g., United States v. Freed,* 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971) (possession of unregistered firearm; $10,000 or ten years or both); *Williams v. North Carolina,* 352 U.S. 226, 65 S.Ct. 1092, 89 L.Ed. 1577 (1945) (bigamy; ten years); *United States v. Dotterweich,* 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943) (misbranded or adulterated drugs; $1000 and/or one year for first offense, $10,000 and/or three years for subsequent offense); *United States v. Balint,* 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922) (unlawful drug sale; five years).

The Supreme Court reversed. Focusing on the "responsible share" language of *Dotterweich,* the Court approved the construction of the courts of appeals "that those corporate agents vested with the *responsibility,* and *power* commensurate with that responsibility, to devise whatever measures are necessary to ensure compliance with the Act bear a 'responsible relationship' to, or have a 'responsible share' in, violations." 421 U.S. at 672, 95 S.Ct. at 1911, 44 L.Ed.2d at 500–01 (footnote omitted; emphasis added). It concluded, "We are satisfied that the Act imposes the highest standard of care and permits conviction of responsible corporate officials who, in light of this standard of care, have the *power to prevent or correct* violations of its provisions." *Id.* 421 U.S. at 676, 95 S.Ct. at 1914, 44 L.Ed.2d at 503 (emphasis added).

Appellant interprets the Supreme Court's holding to mean that the government must prove negligence to sustain a conviction,[23] and argues that due process requires at least as much in the instant case. A holding that section 1081 does not require a showing of negligence, however, in no way conflicts with *Park.* The conclusion reached by the Court in *Dotterweich* and *Park* was in a sense dictated by the nature of the enterprises at which the Food, Drug, and Cosmetic Act is aimed. Defendant Park was the president of a national retail food chain employing approximately 36,000 people, and operating 874 retail outlets,

twelve general warehouses, and four special warehouses. Such a position is hardly analogous to that of the master of a fishing vessel. It is not at all certain that an official of such a corporation has the *power* to prevent violations *merely* by virtue of his position. Therefore, a holding that criminal liability could attach solely upon proof that the corporation committed a violation and the defendant was an officer of the offending corporation would indeed have grave due process implications. A ship's master, on the other hand, has virtually plenary authority over his vessel and her crew. Therefore, proof that a defendant is the "master or other person in charge of" a fishing vessel necessarily also establishes that he had the authority and responsibility to insure compliance with the law.[24]

■ Based on the foregoing considerations, we conclude that proof of culpability or fault was neither statutorily nor constitutionally necessary to sustain Ayo's conviction. In the forfeiture action, appellant urges reversal on the mens rea issue under the same statutory and constitutional rationale, and we reach the same conclusion. *See Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974); *United States v. One (1) 1972 Wood, 19 Foot Custom Boat,* 501 F.2d 1327 (5th Cir. 1974). The elements of a section 1082(b) forfeiture action are the same as those of a section 1082(a) criminal action, except, of course, there is no issue of the

---

23. This is also the interpretation of the dissenting justices:

As I understand the Court's opinion, it holds that in order to sustain a conviction . . . the prosecution must at least show that by reason of an individual's corporate position and responsibilities, he had a duty to use care to maintain the physical integrity of the corporation's food products. A jury may then draw the inference that when the food is found to be in such condition as to violate the statute's prohibitions, that condition was "caused" by a breach of the standard of care imposed upon the responsible official. This is the language of negligence, and I agree with it.

421 U.S. at 678, 95 S.Ct. at 1915, 44 L.Ed.2d at 505 (Stewart, J., joined by Marshall and Powell, JJ., dissenting).

24. This conclusion is not affected by the group structure of the Cubans' fishing operation. It is not clear from the record what authority, if any, the flotilla commander or the mother ship exercised over the other vessels. But in any event, it is clear that Ayo was acting on his own when the violation occurred. Defense counsel questioned Ayo about his separation from the mother ship:

Q And at 1:00 what did the mother ship communicate to you?
A She told me that fishing was very poor, it was pretty bad.
Q And did you and the mother ship discuss what should be done?
A Yes.
Q And did the mother ship indicate to you what you should do now?
A No. I told her what I was going to do.

identity of the master since the proceeding is one in rem. All elements were proved beyond a reasonable doubt.

AFFIRMED.