Wesley P. TART, Appellant,

v.

COMMONWEALTH OF
MASSACHUSETTS,
et al., Appellees.

No. 90–1929.

United States Court of Appeals,
First Circuit.

Heard Jan. 7, 1991.

Decided Nov. 15, 1991.

Michael J. Traft, Boston, Mass., for appellant.

Paula J. DeGiacomo, Asst. Atty. Gen., with whom James M. Shannon, Atty. Gen., Boston, Mass., was on brief, for appellees.

Before CAMPBELL and CYR, Circuit Judges, and POLLAK,* Senior District Judge.

CYR, Circuit Judge.

Wesley Tart, captain of a commercial fishing vessel and holder of a federal commercial fishing license, appeals district court orders rejecting various collateral challenges to his state court conviction for landing raw fish without a commercial fishing permit from the Commonwealth of Massachusetts. We affirm.

## I

### BACKGROUND

In November 1986 an officer of the Massachusetts Department of Fisheries, Wildlife, and Environmental Law Enforcement, while accompanied by an agent of the National Fishery Service, observed Tart's fishing vessel, "Jeromi," unloading raw fish at a Gloucester pier. Shortly after the officers identified themselves, Tart acceded to their request for permission to come aboard. When the officers asked to see his federal fishing license and a state fishing permit, Tart said that he did not believe he was required to obtain a state commercial fishing permit since he held a federal license. The officers seized Jeromi's cargo of raw fish under the authority of a Massachusetts statute which provides that "no person shall fish for or take fish for commercial purposes in the coastal waters, or *land raw fish*, whether frozen or unfrozen, in the commonwealth, for the purpose of sale unless he is a holder of a commercial fishing permit." Mass.Gen.L. ch. 130, § 80 (1991) (emphasis added). Five days later, the same state fisheries officer, accompanied by a local police officer and another fisheries department agent, once again observed Tart unloading raw fish. Tart was arrested after informing the officers that he had not obtained a Massachusetts commercial fishing permit as instructed.

Following his state court conviction, Tart was sentenced to thirty days, all but seven days suspended, and fined fifty dollars. After Tart's conviction was affirmed on direct appeal to the Massachusetts Supreme Judicial Court ("SJC"), *see Commonwealth v. Tart*, 408 Mass. 249, 557 N.E.2d 1123 (1990), Tart filed a habeas corpus petition with the United States District Court for the District of Massachusetts. The district court dismissed the entire habeas petition for failure to exhaust state remedies with respect to one claim. Alternatively, the district court ruled that all six claims for relief were meritless.

## II

### DISCUSSION

A. *Procedural Bars to Federal Habeas Review*

1. Instruction on Burden of Proof of Licensure

 a. *Exhaustion of State Remedies*

Tart first contends that the district court erroneously dismissed his habeas petition for failure to resort to available state remedies for challenging a state court jury instruction that Tart, rather than the Commonwealth, bore the burden of proof as to

---

* Of the Eastern District of Pennsylvania, sitting by designation.

whether Tart possessed a valid Massachusetts commercial fishing permit.[1]

■ A federal court may not issue a writ of habeas corpus "unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner." 28 U.S.C. § 2254; *see also Ex parte Royall,* 117 U.S. 241, 250–54, 6 S.Ct. 734, 739–41, 29 L.Ed. 868 (1886). Where a section 2254 petition pleads multiple federal claims, the federal character of any of which has not fairly been presented to the state courts, the federal court must dismiss the entire petition, including any exhausted claims. *See Rose v. Lundy,* 455 U.S. 509, 513–521, 102 S.Ct. 1198, 1200–05, 71 L.Ed.2d 379 (1982); *Gagne v. Fair,* 835 F.2d 6, 9 (1st Cir.1987); *Dougan v. Ponte,* 727 F.2d 199, 200 (1st Cir.1984). The petitioner then may elect to dismiss all unexhausted claims or seek their disposition in state court before proceeding under section 2254. *See Rose,* 455 U.S. at 520, 102 S.Ct. at 1204.[2]

■ Citing to our decision in *Nadworny v. Fair,* 872 F.2d 1093 (1st Cir.1989), Tart argues that he adequately alerted the state courts to the federal nature of his jury instruction challenge by citing several Massachusetts decisions whose holdings explicitly relied on federal caselaw. We have delineated the pertinent criteria for determining whether the state court fairly was alerted to the federal character of a constitutional claim. Among other criteria, we inquire whether the petitioner presented the state court with a claim whose substance must have alerted the state court to its federal character. *See id.* at 1097. Generally, citation to a state decision whose holding is prominently predicated on federal precedent is sufficient. *See id.* at 1103.[3] The "fair presentation" test is based in principles of comity, and accords appropriate respect to the States' prerogative "to develop a caselaw rich enough to sustain the protection of federal constitutional rights under the[ir] ... own precedent." *Id.* at 1101. The federal habeas forum must emphasize substance over form by scrutinizing the "essence" of the legal theory previously presented to the state court. *See id.*

The brief presented to the SJC cited at least two SJC decisions explicitly and prominently predicated on federal constitutional caselaw. *See Commonwealth v. Claudio,* 405 Mass. 481, 541 N.E.2d 993 (1989) (citing *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979); *United States v. United States Gypsum Co.,* 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); *Morissette v. United States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952)); *Commonwealth v. Moreira,* 385 Mass. 792, 434 N.E.2d 196 (1982) (citing *Sandstrom,* 442 U.S. at 514, 99 S.Ct. at 2454; *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *McInerney v. Berman,* 473 F.Supp. 187 (D.Mass.1979), *aff'd,* 621 F.2d 20 (1st Cir.1980), *cert. denied,* 449 U.S. 867, 101 S.Ct. 201, 66 L.Ed.2d 85 (1980)).

The Commonwealth proposes two bases for disputing the sufficiency of Tart's presentation to the SJC. First, the facts in both SJC cases, *Claudio* and *Moreira,*

---

1. The jury instruction stated, in pertinent part: Under Massachusetts law, any person who is a commercial fisherman before they can land raw fish or any fish on the dock[s] of Massachusetts must have a commercial fishermen's license or permit. Now, under our law when a person is required to have a license or permit, that person must prove they have it. Therefore, until it is proven, you can draw an inference that the license or permit does not exist. Therefore, and it has to be proved to you beyond a reasonable doubt that the person did not have a commercial license to fish.

2. On appeal, Tart indicates that he will abandon the claim presently under discussion should we conclude that it was not exhausted.

3. As noted in *Nadworny,* however, rarely, if ever, is it sufficient to cite to state court precedent where the *defendant* in the cited case relied on federal caselaw, but the state court decision does not rely on the cited federal caselaw. *See id.* at 1098 (citing *Anderson v. Harless,* 459 U.S. 4, 7 n. 3, 103 S.Ct. 276, 278 n. 3, 74 L.Ed.2d 3 (1982) (per curiam)).

were so dissimilar from the present case that the SJC was not fairly alerted to their bearing on petitioner's federal constitutional claim, particularly since both cases concerned state statutes governing the presumptive effect a jury must accord laboratory tests for detecting alcohol and controlled substances, whereas the instant case concerns the burden of proving licensure.

We examine the theory underlying petitioner's constitutional claim in order to determine whether *Claudio* and *Moreira* reasonably should have alerted the SJC to the essential federal constitutional tenets relied on in Tart's section 2254 petition; namely, the federal due process implications of a defendant's right to require the State to prove each element of the criminal charge beyond a reasonable doubt, *see In re Winship*, 397 U.S. 358, 361–362, 90 S.Ct. 1068, 1071, 25 L.Ed.2d 368 (1970), and the federal constitutional limitations on State legislative power to define a crime so as to shift to the criminal defendant the burden of proof relating to an essential element of the crime. *See Mullaney v. Wilbur*, 421 U.S. 684, 703–704, 95 S.Ct. 1881, 1892, 44 L.Ed.2d 508 (1975) (state may not transfer to defendant the burden of proving that he did not act in heat of passion on sudden provocation, since historical trend treats lack of justification as element of crime).

The following Massachusetts statute provided the basis for the state court instruction to the Tart jury:

> A defendant in a criminal prosecution, relying for his justification upon a license, appointment, admission to practice as an attorney at law, or authority, shall prove the same; and, until so proved, the presumption shall be that he is not so authorized.

Mass.Gen.L. ch. 278, § 7 (1981). Were the lack of a valid state fishing permit an essential "element" of the criminal offense defined in section 80, the presumption pre-

scribed in the Massachusetts statute might indeed be found infirm on federal due process grounds, as were the mandatory presumptions at issue in *Claudio* and *Moreira*.

Second, the Commonwealth argues that Tart necessarily focused on state law grounds in presenting his earlier claim before the state courts, because the federal cases cited in *Claudio* and *Moreira* offered Tart no prospect of prevailing on his federal constitutional claim. The district court apparently concluded that the Massachusetts Constitution is more protective of Tart's due process rights in the present regard and, further, that it would be permissible under the Federal Constitution to shift the burden of proof so as to require Tart to establish possession of a state fishing permit.[4]

The proper inquiry under the exhaustion doctrine focuses on the content of the *petitioner's presentation* of the claim, with a view to whether the state court fairly was alerted to its federal character and whether the state court was afforded an opportunity to pass on the validity of the federal constitutional grounds underlying the claim. Neither the relative merit of a colorable federal claim vis-a-vis a parallel state law claim, nor the ultimate determination by the state court as to whether the federal theory warrants acceptance, generally provides an accepted basis for triggering the exhaustion doctrine. Further, as the federal caselaw cited in *Claudio* and *Moreira* exemplifies, the precise scope of the States' power to shift the burden of proof to a criminal defendant remains unsettled under federal constitutional law. *Compare Mullaney v. Wilbur*, 421 U.S. at 697, 95 S.Ct. at 1888–89, *with In re Winship*, 397 U.S. at 364, 90 S.Ct. at 1072–73 (discussing when proof of fact is constitutionally necessary to establish crime). We

---

**4.** The district court distinguished *Nadworny* by noting that Tart's federal constitutional claim was appreciably weaker than his state constitutional claim:

> But here I have a problem. Here, it is constitutional for the state to place [the burden of

proof on the defendant as to an element of the crime] under the federal constitution, [but] it isn't under the Massachusetts constitution, we're very clear on that, but affirmative defenses can be placed by states under the federal constitution on the defendant.

therefore conclude that Tart exhausted available state remedies.

### b. Preclusive Effect of State Procedural Default

Having concluded that Tart's entire habeas petition was not barred for failure to exhaust state remedies, we turn to consider whether his first habeas claim, based on the above-referenced jury instruction, was properly dismissed. The district court concluded, *inter alia*, that Tart's failure to assert a contemporaneous challenge to the jury instruction, and the SJC's decision not to waive the procedural default, constituted an independent state law ground for the SJC's refusal to grant relief, thus precluding district court consideration of any federal basis for the same claim. *See Wainwright v. Sykes*, 433 U.S. 72, 86–87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977). Tart contends that the Massachusetts contemporaneous objection rule was waived when the SJC implicitly concluded that its refusal to provide relief from the state procedural default would not constitute a "miscarriage of justice" under federal constitutional principles.

 The mere fact that a state appellate court engages in a discretionary, and necessarily cursory, review under a "miscarriage of justice" analysis does not in itself indicate that the court has determined to waive an independent state procedural ground for affirming the conviction. *See Puleio v. Vose*, 830 F.2d 1197, 1200 (1st Cir.1987); *McCown v. Callahan*, 726 F.2d 1, 3 (1st Cir.1984). We will not infer waiver of a contemporaneous objection rule unless the state appellate court has made it "reasonably clear that its reasons for affirming a conviction rest upon its view of federal law." *See Doucette v. Vose*, 842 F.2d 538, 540 (1st Cir.1988). For reasons of comity and in recognition of the impor-

tant state interests served by state procedural rules, where the state court has grounded its disposition of the claim on a state procedural rule violation, the petitioner cannot present the claim to us absent a showing of "cause" for noncompliance with the state rule, as well as actual prejudice. *See Wainwright*, 433 U.S. at 86–87, 97 S.Ct. at 2506; *Carsetti v. State of Maine*, 932 F.2d 1007, 1009 (1st Cir.1991). A mere assertion of attorney inadvertence normally does not constitute sufficient "cause" to excuse a state procedural default. *See Palmariello v. Superintendent of M.C.I. Norfolk*, 873 F.2d 491, 493 (1st Cir.1989).[5]

Under the Massachusetts contemporaneous objection rule, an objection to a jury instruction must be made before the jury retires to deliberate. *See* Mass.R.Crim.P. 24(b). The SJC first determined that Tart's failure to object at trial meant that his jury instruction challenge was entitled to discretionary appellate review only for "miscarriage of justice." *Tart*, 557 N.E.2d at 1134–1135. The SJC further decided that the trial court had bracketed the challenged jury instruction with other, proper statements of the law, correctly placing upon the Commonwealth the burden of proving that Tart had not obtained a state fishing permit. *Id.* 557 N.E.2d at 1135.

 Although relevant to the state exhaustion issue, Tart's reliance on the fact that his SJC brief cited to state caselaw premised on federal constitutional law is of no avail in the present context, since the SJC decision cited to none of those state cases. There is no indication in the SJC's discussion of this issue that "the court researched, examined in depth, or intended to rely upon, federal law in the area." *McCown*, 726 F.2d at 4. Instead, throughout its discussion on this issue the SJC merely proceeded under the view that there was "no substantial risk of a miscarriage

---

**5.** Recently, the *Wainwright* rationale was reaffirmed in *Coleman v. Thompson*, —— U.S. ——, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Addressing a question specifically reserved in *Wainwright, Coleman* involved a situation in which the petitioner's *entire* federal habeas petition was barred by a state appellate court determination that petitioner had failed to file a

timely notice of appeal from final judgment. The Supreme Court held that, unless it "fairly appear[ed]" that the decision of the state's highest court rested primarily on federal law, comity considerations required that federal courts refrain from addressing the claim, absent a showing of cause and actual prejudice. *Id.* 111 S.Ct. at 2559, 2565.

of justice" because the trial court may not in fact have effected a shift in the burden of proof to Tart. *See Tart*, 557 N.E.2d at 1135. The clear import of its discussion is that the SJC based its decision strictly on Tart's procedural default under Mass. R.Crim.P. 24(b).

Thus, Tart was required to show "cause" for failure to comply with the Massachusetts contemporaneous objection rule. *Wainwright*, 433 U.S. at 86–87, 97 S.Ct. at 2506. As trial counsel inadvertence does not constitute "cause," *see Palmariello*, 873 F.2d at 493, Tart's jury challenge claim is ineligible for federal habeas review.

## B. *The Merits*

### 1. Fourth Amendment Claim

■ The second habeas claim asserts a fourth amendment violation.[6] Tart argues that the fisheries officers first boarded the Jeromi without a warrant and with no rea-

sonable suspicion justifying a documentation check.[7] The Commonwealth supports the first boarding as either a valid consent search[8] or a reasonable documentation check of a seagoing vessel. The SJC and the district court concluded that the first search was a reasonable administrative inspection in a closely-regulated industry and that the warrant requirement was obviated by reason of the administrative criteria restricting the fisheries officer's discretion to a mere request for licensure documentation. *See Tart*, 557 N.E.2d at 1127–1130 (citing *New York v. Burger*, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987)).

■ The SJC and the district court determined that the documentation check in this case was a valid warrantless administrative search. Massachusetts law provides that state fishing permits "shall be produced for examination upon demand of any authorized person."[9] Mass.Gen.L. ch.

---

**6.** As a preliminary matter, neither Tart nor the Commonwealth raised the issue in the district court as to whether Tart was afforded a "full and fair opportunity" to present his fourth amendment claim in state court. Absent such an affirmative showing by the petitioner, principles of comity require that federal habeas review of fourth amendment claims be refused. *See Stone v. Powell*, 428 U.S. 465, 494–495, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976); *Wicker v. McCotter*, 783 F.2d 487, 497 (5th Cir.1986); *Palmigiano v. Houle*, 618 F.2d 877, 880 (1st Cir.1980); *Williams v. Brown*, 609 F.2d 216, 220 (5th Cir.1980); *Pignone v. Sands*, 589 F.2d 76, 79 (1st Cir.1978). It is a perilous practice for a federal habeas corpus petitioner to rely on the State's failure to assert its *Stone* defense in the district court, especially in the face of caselaw in at least one other circuit that recognizes the discretionary authority of federal appellate courts to raise the *Stone* prohibition *sua sponte*, even in cases where the State has failed to invoke its protection. *See Bell v. Lynaugh*, 828 F.2d 1085, 1091–92 (5th Cir.1987), *cert. denied*, 484 U.S. 933, 108 S.Ct. 310, 98 L.Ed.2d 268 (1987); *Davis v. Blackburn*, 803 F.2d 1371, 1372–73 (5th Cir.1986).

Even in those cases where the federal court might not have reached the same decision on the merits as the state court, *see Palmigiano*, 618 F.2d at 882, federal courts generally should refuse habeas review where the petitioner does not allege or prove the State's denial of a full and fair opportunity to present the claim. Nevertheless, an examination of the state court record discloses no intrinsic or systemic infirmity in resolving Tart's fourth amendment claim. Since we are in complete agreement

with the SJC's analysis on the merits of the fourth amendment claim, we need not rest our decision on Tart's failure to satisfy the requirements of *Stone v. Powell*.

**7.** Tart insists that only his failure to produce a state fishing permit at the time of the first boarding could have provided arguable ground on which the officers might have based a reasonable suspicion of a continuing violation of section 80 at the time of the second boarding five days later. Tart therefore urges that all evidence seized during the second boarding should be suppressed as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

**8.** Although Tart arguably consented to the boarding of his vessel, the voluntariness of the consent is made somewhat problematic due to a Commonwealth statute which criminalizes a refusal to permit fisheries officers to board a vessel for a documentation check or cargo inspection. *See* Mass.Gen.L. ch. 90B, § 12, ch. 130, §§ 2, 130.

**9.** Tart contends that section 2 does not by its terms authorize any fisheries officer to make documentation checks, but merely defines the failure to comply with such a demand as an offense. Considered in the context of the Commonwealth's overall regulatory scheme as set out in chapter 130, which describes the central role of fisheries officers in the enforcement of fisheries regulations, we conclude that section 2 impliedly authorizes fisheries officers to make routine documentation requests without a war-

130, § 2. Tart's claim is based entirely on the officers' request to be shown a fishing permit. Since the fisheries officers observed raw fish being unloaded from the Jeromi prior to their request to come aboard, and boarded the vessel only to request documentation, Tart's failure to produce a state fishing permit provided the officers with probable cause to believe Tart had violated section 80 and justified the ensuing seizure.

Under the test set out in *New York v. Burger*, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987), a warrantless inspection in a "closely-regulated" industry, pursuant to statute, is valid if (1) it serves a "substantial" governmental interest, (2) is necessary to effectuate an administrative scheme, and (3) is structured so as to limit the discretion of the inspecting officer, thus providing a "constitutionally adequate substitute for a warrant." *Id.* at 702–703, 107 S.Ct. at 2644. Tart appears to concede that the fishing industry is "closely-regulated" and that the first two prongs of the *Burger* test were satisfied. *See infra* at § B.2.

Under the third prong of the *Burger* test, the regulatory statute must (1) alert owners that their premises are "subject to periodic inspections undertaken for specific purposes," *Burger*, 482 U.S. at 703, 107 S.Ct. at 2644 (quoting *Donovan v. Dewey*, 452 U.S. 594, 600, 101 S.Ct. 2534, 2539, 69 L.Ed.2d 262 (1981)), and (2) carefully constrain official discretion respecting the time, place and scope of periodic inspections, *id.* Tart contends that the boarding of the Jeromi for the limited purpose of requesting production of the necessary state-issued documentation of the vessel cannot be upheld as a valid administrative inspection of a closely-regulated industry because section 2 places insufficient constraints on the exercise of official discretion.[10]

We conclude that section 2, although a tersely phrased authorization to conduct documentation checks, imports sufficient implicit limitations upon the exercise of the fisheries officer's discretion in the field. Contrary to Tart's contention, the governing statute need not in all circumstances prescribe exhaustive restrictions limiting the target, time and place of the inspection. For example, in *Burger* the Supreme Court held that the statute there involved placed the owner-defendant on adequate notice as to the *types* of businesses and properties subject to routine inspection. *Id.* at 711, 107 S.Ct. at 2648 (statute placed all operators engaged in vehicle-dismantling business on notice of potential exposure to unannounced inspections). The statute at issue in *Burger* did not limit the discretion of inspectors in the field concerning which vehicle-dismantling businesses would be subjected to inspection; indeed, the Supreme Court acknowledged that there was no evidence as to the reason the agents had chosen Burger's premises for inspection from a general list of vehicle dismantlers. *Id.* at 694 n. 1, n. 2, 107 S.Ct. at 2639 n. 1, n. 2. Section 2 similarly placed Tart, and others engaged in commercial fish landings in Massachusetts, on adequate notice that routine documentation checks might occur at any time, particularly when fishing in Commonwealth coastal waters or landing raw fish at Commonwealth ports.

The rationale underlying the administrative search exception to the warrant requirement recognizes that the significance of the governmental interest at stake may lessen the expectation of privacy to which operators engaged in certain closely-regulated industries are reasonably entitled. Given the minimally intrusive nature of the documentation inspection in the present case, we conclude that it was not essential that section 2 contain an explicit "checklist" of time and place limitations for con-

---

rant. *See* Mass.Gen.L. ch. 130, §§ 9 ("Any such person or officer may arrest without a warrant any person found violating any provision of this chapter"), 13 (officers empowered to demand inspection of unlawfully-taken fish).

**10.** Tart argues that the Commonwealth subsequently amended its marine fish and fisheries

statutes in recognition that the predecessor statutes did not contain sufficient limitations to serve as adequate substitutes for a warrant. *See* Mass.Gen.L. ch. 130, § 4A. On the contrary, section 4A involves inspections of fishing gear, nets, cargo, and fish holds, and does not purport to limit documentation checks.

ducting documentation inspections. In *Burger*, the constitutionality of the statutory scheme was challenged on the ground that the statute limited neither the frequency nor the number of inspections allowed within a fixed period of time. The Court noted that "[w]hile such limitations, or the absence thereof, are *a factor* in an analysis of the adequacy of a particular statute, they are not determinative of the result so long as the statute, *as a whole,* places adequate limits upon the discretion of the inspecting officers." *Id.* at 711 n. 21, 107 S.Ct. at 2648 n. 21 (emphasis added). The lack of explicit constraints on the officers' discretion is not determinative.

Considered in the context of the entire regulatory scheme applicable to the commercial fishing industry in the Commonwealth, section 2 cannot be viewed as enabling generalized exploratory inspections typically associated with intrusive administrative inspection schemes. Rather, we think section 2 constrains the exercise of official discretion to the minimum enforcement measures required to assure reasonable compliance with the permitting regulations of Chapter 130. *Cf. id.* at 694 n. 1, 107 S.Ct. at 2639 n. 1 (warrantless inspections of business records and automobile inventories). Documentation checks represent a reasonable alternative to the posting of fishing permits in public view. *See United States v. Villamonte–Marquez,* 462 U.S. 579, 589–90, 103 S.Ct. 2573, 2580, 77 L.Ed.2d 22 (1983). Thus, section 2 only authorizes state fisheries officers to request presentation of the required documentation. Section 2 does not empower the fisheries officer to proceed further without a warrant. The minimally intrusive nature of a proper verbal request to produce required documentation, and the importance of the governmental interests served by the Commonwealth's permitting requirement, satisfy us that the documentation inspection in this case did not offend the fourth amendment.

## 2. Section 80 Preemption

■ The third habeas claim maintained that section 80, which criminalizes the landing of raw fish in Massachusetts without a commercial fishing permit, is preempted by 46 U.S.C. § 122, which provides that "[n]o vessel belonging to any citizen of the United States, trading from one port within the United States to another port within the United States, or employed in the bank, whale, or other fisheries, shall be subject to tonnage tax or duty, if such vessel be [federally] licensed, registered or enrolled." 46 U.S.C. § 122 (1987). Since Tart held a federal commercial fishing license, fished beyond Commonwealth territorial waters, and sold no cargo within the Commonwealth, he considers the section 80 permit fee a "tonnage tax or duty," within the meaning of 46 U.S.C. § 122. *See Transportation Co. v. Parkersburg,* 107 U.S. 691, 696–698, 2 S.Ct. 732, 736–38, 27 L.Ed. 584 (1883) (tonnage tax or duty charge imposed for privilege of entering, trading, or remaining in port).

■ We first identify the federal legislation implicated by the preemption claim. Although he argues on appeal that federal statutes other than section 122 preempt the Commonwealth's fishing permit scheme, including 16 U.S.C. §§ 1801–1882 (1991) (Magnuson Fishery Conservation and Management Act) and 16 U.S.C. § 3371–3378 (1984 & Supp.1991) (Lacey Act Amendments of 1981), Tart developed neither of these arguments in the state trial court. Federal habeas review of those particular preemption claims is therefore precluded.[11] Neither did Tart expressly cite to

**11.** The state trial court memorandum in support of Tart's motion to dismiss contained but one oblique, isolated reference to section 1801 of the Magnuson Act, advancing only the general proposition that the coastal waters fished by the Jeromi are "extensively regulated" by various federal agencies, and that no state may regulate a federally-licensed vessel engaged in *fishing* within the Magnuson zone. While the Magnuson Act does purport to prohibit direct or indirect state regulation of *fishing* outside the state's territorial waters, *see* 16 U.S.C. § 1856(a), Tart even now cites to no specific provision of the Magnuson Act which would prohibit a state from regulating the voluntary decision of a federally-licensed fishing vessel to enter a state port for the purpose of landing raw fish, especially when, as hereinafter demonstrated, the state regulation promotes a valid public health objective of the state.

**500**

the federal fishing licensing statute, 46 U.S.C. §§ 12101–12122, but since section 122 expressly protects a *federally-licensed* vessel, we address the broader preemptive effect, if any, of both section 122 and sections 12101–12111.

■ Federal preemption of a state statute typically obtains in any of three scenarios: (1) the federal statute expressly preempts all state regulation of the same subject matter, *see Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977); (2) the scheme of federal regulation, although not expressly preemptive, is so pervasive as to generate the reasonable inference that Congress intended to leave no domain open to state regulatory supplementation, *see Pacific Gas & Electric Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 204, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983); or (3) the federal statute and a state statute are in direct conflict, either because it would be impossible fully to comply with both or because enforcement of the state statute would frustrate the congressional purpose underlying the federal statute. *Id.*

■ Tart does not contend that either section 122 or sections 12101–12122 contain an express preemption provision. Neither could he argue that federal licensing statutes so pervasively regulate coastal fishing activities as to leave no room for collateral or supplemental regulation by the Commonwealth. Moreover, where federal legislation regulates in an area traditionally occupied by the States, such as the regulation of coastal fishing, a preemptive intent will be inferred only if it is the manifest purpose of Congress. *Douglas v. Seacoast Products, Inc.,* 431 U.S. 265, 272, 97 S.Ct. 1740, 1745, 52 L.Ed.2d 304 (1977). Tart argues, however, that the section 80 prohibition against unlicensed landing of raw fish in the Commonwealth cannot be justified as an attempt to conserve Common-

wealth fishery resources, at least not where the defendant took the fish outside Commonwealth waters.

Of course, resource conservation is not the only legitimate purpose served by permissible commercial fishing regulation on the part of the States. The police powers of the State may supplement a federal regulatory scheme as reasonably required for the protection of the health and welfare of the State's citizens. For example, in *Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960), the Court upheld a state court's refusal to enjoin enforcement of the criminal provisions of a municipal anti-pollution ordinance against several federally-licensed vessels docked at the Port of Detroit. One of the arguments presented by the vessel owners and operators was that federal licensure and enrollment under the provisions of Title 46 gave "the vessels ... a dominant federal right to the use of the navigable waters of the United States, free from local impediment." *Id.* at 447, 80 S.Ct. at 818. The Court discussed the permissibility of state regulation designed to protect public health and welfare:

*The mere possession of a federal license, however, does not immunize a ship from the operation of the normal incidents of local police power, not constituting a direct regulation of commerce.* Thus, a federally licensed vessel is not, as such, exempt from local pilotage laws, Cooley v. Board of Wardens of Port of Philadelphia, 12 How. 299 [13 L.Ed. 996], or local quarantine laws, *Morgan's Steamship Co. v. Louisiana Board of Health* [6 S.Ct. 1114], 118 U.S. 455 [30 L.Ed. 237], or local safety inspections, *Kelly v. Washington,* 302 U.S. 1 [58 S.Ct. 87, 82 L.Ed. 3], or the local regulation of wharves and docks, *Packet Co. v. Catlettsburg,* 105 U.S. 559 [26 L.Ed. 1169]. Indeed this Court has gone so far as to hold that a state, in the exercise of its police power, may actually

Finally, Tart's memorandum before the state trial court made no reference at all to the Lacey Act in its discussion of preemption. The SJC's decision not to address the preemptive effect of these two federal statutes is based explicitly on

Tart's failure to raise these claims in the state trial court. As noted, an unwaived procedural default in the state court bars federal habeas review absent a showing of cause for noncompliance and resulting prejudice.

seize and pronounce the forfeiture of a vessel "licensed for the coasting trade, under the laws of the United States, while engaged in that trade." *Smith v. Maryland,* 18 How. 71, 74 [15 L.Ed. 269]. The present case obviously does not even approach such an extreme, for the Detroit ordinance ... does not exclude a licensed vessel from the Port of Detroit, nor does it destroy the right of free passage.

*Id.* at 447–448, 80 S.Ct. at 818 (emphasis added).

■ A federal commercial fishing license entitles the vessel to fish beyond State territorial waters, generally unimpeded by state regulation. The federal license allows the vessel to *navigate* within State territorial waters and to *take fish* from those waters, subject only to reasonable, nondiscriminatory State regulation designed to *conserve* fish reserves within State waters. *See id.* Since the federal licensing statute, 46 U.S.C. §§ 12101–12122, plainly does not occupy the field, but allows for a wide array of supplemental state regulation for furthering resource conservation and public health, Tart bears the heavy burden of demonstrating a direct conflict between the federal and state statutes. As it was not physically impossible for Tart to comply with both regulatory systems, Tart must show that enforcement of section 80 would frustrate the underlying policy of federal licensure.

The legitimate purposes of Mass.Gen.L. ch. 130, § 80, are readily apparent. Section 80's prohibition against *taking* fish from Commonwealth coastal waters without a state permit is a conservation law, *see Barlow v. Wareham,* 401 Mass. 408, 517 N.E.2d 146 (1988), applicable to Commonwealth residents and nonresidents alike.[12] On the other hand, section 80's prohibition against *landing* raw fish in Massachusetts without a permit from the Commonwealth is an integral element in a broader regulatory scheme governing all wholesale and retail handlings of raw fish within the Commonwealth, which requires the promulgation of rules by both the Division of Marine Fisheries and the Public Health Commission, and allocates permit fees to defray the costs of administering the Division of Marine Fisheries' research, management and other activities.[13] Transshipment of raw fish through Commonwealth ports presents an appropriate occasion for the exercise of the Commonwealth's police power in furtherance of the public health of its citizens. Absent its regulation of raw seafood landings, the Commonwealth could achieve no reasonable assurance that raw fish landed in the Commonwealth would be fit for human consumption in Massachusetts.[14] We conclude that section 80 constitutes "[e]venhanded local regulation to effectuate a legitimate local public interest" in promoting public health by protecting Massachusetts consumers from exposure to seafood unfit for human consumption. *Huron Portland Cement,* 362 U.S. at 443, 80 S.Ct. at 816. Thus, section 80 is not preempted by the federal statutes relied on by Tart.

### 3. Mens Rea Instruction

■ Tart claims that his due process rights were violated by the failure to instruct the jury that the Commonwealth was required to establish that Tart had a culpable state of mind and that a reasonable mistake of law as to the applicability of section 80 would preclude conviction. The Commonwealth contends that section 80 establishes a "public welfare" crime, consisting only of forbidden acts or omissions, and therefore is not invalidated by the Legislature's plain intent to eschew a *mens rea* element. *See Morissette v. Unit-*

---

**12.** Tart was not charged with taking fish from Commonwealth waters.

**13.** The Commonwealth argues that the permit fee is not a "tonnage tax or duty" proscribed by section 122, but is in the nature of a "wharfage fee" to compensate the Commonwealth for the *use* of public wharves in landing fish. Contrary to the Commonwealth's contention, however,

section 80 does not condition the imposition of a permit fee on the type of wharf used by the permittee. Therefore, we are not prepared to characterize the permit fee as a wharfage fee.

**14.** As the SJC noted, Tart was not contractually bound to sell his cargo outside the Commonwealth at the time of the seizure and arrest. *See Tart,* 557 N.E.2d at 1132 n. 5.

*ed States,* 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952).

Absent clear evidence of a contrary legislative intent, a criminal statute generally is presumed to include a requirement that the state establish a culpable state of mind on the part of the defendant. *See id.* at 250–51, 72 S.Ct. at 243. It is a well-settled principle of constitutional law, however, that "[t]here is wide latitude in the lawmakers to declare an offense and to exclude elements of knowledge and diligence from its definition." *Lambert v. California,* 355 U.S. 225, 232, 78 S.Ct. 240, 245, 2 L.Ed.2d 228 (1957). The Supreme Court frequently has upheld legislative enactments proscribing so-called "public welfare" offenses. These enactments dispense with any requirement that the defendant have acted intentionally or knowingly, instead imposing penalties as a regulatory measure and placing the burden of compliance upon an otherwise nonculpable person who occupies a position that entails responsibility for preventing a public harm. *See United States v. Dotterweich,* 320 U.S. 277, 280–281, 64 S.Ct. 134, 136, 88 L.Ed. 48 (1943).

Certain recognized factors are considered suggestive of a legislative intent to criminalize conduct as a public welfare offense: [15]

> [W]here a ... criminal statute omits mention of intent and where it seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where conviction does not gravely besmirch [the reputation], where the statutory crime is not one taken over from the common law, and where [legislative] purpose is supporting, the statute can be construed as one not requiring criminal intent. The elimination of this element is then not violative of the due process clause.

*Holdridge v. United States,* 282 F.2d 302, 310 (8th Cir.1960). We agree with the SJC, *see Tart,* 557 N.E.2d at 1133–1134, and with the district court, that section 80 proscribes conduct constituting a public welfare offense, and we confine further discussion to the specific contentions raised on appeal.

■ First, Tart argues that section 80 articulates no legislative intent to enact a strict liability statute. If a statute establishes a new crime analogous to a criminal offense recognized at common law, but is silent as to the required state of mind, the courts more readily read a *mens rea* requirement into the statute. *See United States v. Ayo–Gonzalez,* 536 F.2d 652, 661 (5th Cir.1976), *cert. denied,* 429 U.S. 1072, 97 S.Ct. 808, 50 L.Ed.2d 789 (1977) (statute prohibiting foreign vessels from entering state waters held not analogous to common law trespass or poaching). Absent an appropriate common law analogue, we examine the entire statutory scheme to determine the legislative intent in omitting mention of a state-of-mind element.

■ As the section 80 offense of landing raw fish without a permit is a regulatory offense not known at common law, legislative silence should not be construed to import a common law *mens rea* requirement. In addition, most other sections of Chapter 130, defining similar licensing violations, likewise prescribe no state-of-mind requirement. It is especially noteworthy, however, that in section 1 of Chapter 130, the Legislature employed the term "knowingly" to define the state of mind required of a person who "counsels, aids or assists in a violation of any provision of this chapter." The express requirement of a culpable state of mind in section 1 of Chapter 130 seems to indicate that the Massachusetts Legislature affirmatively intended to dispense with a culpable state-of-mind requirement on the part of a person charged as a principal under section 80.

---

**15.** Although not raised here, a related question is presented where the legislative enactment requires a culpable state of mind but it is unclear whether the requirement extends to all elements of the offense. *See Liparota v. United States,* 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985).

Second, Tart argues that a reasonable person engaging in the conduct criminalized under section 80 would not be on notice that he was violating the law. *See Lambert,* 355 U.S. at 227, 78 S.Ct. at 242 (criminalization of unknowing failure of convicted felon to register with municipal police department held unconstitutional, since defendant reasonably would not inquire about need to register). Unlike the municipal registration requirement at issue in *Lambert,* however, a reasonable person engaged in the commercial fishing industry, which has long been subject to licensing at both the federal and state levels, almost surely would become aware of the Massachusetts commercial fishing permit requirement. Since section 80 serves an important state policy by controlling the obvious risks involved in landing raw fish within the Commonwealth, we conclude that, unlike the omission criminalized in *Lambert,* a reasonable person in Tart's position would become aware, readily and without difficulty, of the duty to obtain a commercial permit from the Commonwealth. *Cf. id.* at 229, 78 S.Ct. at 243 (no proof of probability of defendant's knowledge of need to register with city officials).

Finally, Tart offers no support for the contention that strict liability offenses cannot be made punishable by a term of imprisonment. *See Ayo–Gonzalez,* 536 F.2d at 661 (rejecting contention that one-year term of imprisonment rendered strict liability fishing regulation unconstitutional). The maximum term of imprisonment which may be prescribed for a strict liability crime correlates to the seriousness of the harm the statute was intended to prevent. Given the seriousness of the public health consequences attendant upon unregulated landings of raw fish within the Commonwealth, a thirty-day maximum term of imprisonment and a maximum fine of fifty dollars does not infringe due process. We turn briefly to Tart's two remaining claims.

### 4. Cruel and Unusual Punishment

Tart contends that the imposition of a thirty-day sentence, with all but seven days suspended, constituted cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution. We examine the sentence with a view to whether it is grossly disproportionate, considering the seriousness of the offense in relation to the harshness of the punishment. *See Solem v. Helm,* 463 U.S. 277, 290–292, 103 S.Ct. 3001, 3009–11, 77 L.Ed.2d 637 (1983).[16] Given the importance of the Commonwealth's interest in the regulatory scheme fostered by section 80, and the fact that Tart was warned by the state fisheries

---

**16.** Tart contends that *Solem* would require us to consider other sentences of imprisonment imposed for comparable offenses in Massachusetts and other jurisdictions. Although *Solem* remains controlling precedent for eighth amendment challenges to allegedly disproportionate sentences, its scope continues to undergo Supreme Court definition. In *Harmelin v. Michigan,* — U.S. ——, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), several opinions were filed; on the *Solem* issue, no single opinion commanded the support of a majority of the Court. However, it appears that five of the Justices favored either an outright abandonment of the *Solem* test (Justice Scalia, joined by Chief Justice Rehnquist), or, at a minimum, a strict limitation on the requirement that the reviewing court engage in a comparative analysis of sentences imposed for analogous offenses (Justice Kennedy, joined by Justices O'Connor and Souter). In a concurrence joined by Justices O'Connor and Souter, Justice Kennedy maintained that such "intra- and inter-jurisdictional analyses are appropriate only in the *rare case* in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Id.* 111 S.Ct. at 2707 (emphasis added). Considering the seriousness of a violation of section 80 in relation to the sentence imposed on Tart, no such initial inference of gross disproportionality reasonably can be drawn in the present case, thereby obviating the need to engage in any comparison of the challenged sentence with sentences in Massachusetts or other jurisdictions. Furthermore, even if we were to conclude that Tart's sentence raised a threshold inference of gross disproportionality, Tart has failed on appeal to cite cases from Massachusetts or other jurisdictions involving sentences imposed for the same or a comparable offense. We independently note, however, that the caselaw is rife with examples of comparable crimes for which terms of imprisonment of similar duration were routinely upheld. *See, e.g., United States v. Sachs,* 679 F.2d 1015 (1st Cir.1982) (thirty-day sentence for offense of refusing to stand while in elevator of federal building, inarguably valid under eighth amendment analysis); *Ayo–Gonzalez,* 536 F.2d 652 (5th Cir.1976) (one-year sentence for illegal fishing).

officer that he should obtain a Commonwealth permit before again landing fish in the Commonwealth, the district court properly concluded that the thirty-day sentence cannot be considered grossly disproportionate.

### 5. Miranda Warnings

Tart's final argument is that the state fisheries officer's failure to administer *Miranda* warnings, *see Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), prior to the second boarding of the Jeromi, violated the fifth amendment, since the officers knew, before asking Tart to produce a state fishing permit, that he would be placed under arrest if he failed to produce one. The subjective intent of an interrogating officer is immaterial in determining whether the defendant was in "custody" for *Miranda* purposes. *See Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984). The "custody" determination is an objective one, which focuses on whether a reasonable person in the same circumstances would believe he was not free to leave. *See United States v. Ortega–Santana,* 869 F.2d 12, 14 (1st Cir.1989); *United States v. Quinn,* 815 F.2d 153, 160–161 (1st Cir.1987). The findings of fact made by the state court generally are entitled to great deference on federal habeas review. *See* 28 U.S.C. § 2254(d); *Tavares v. Holbrook,* 779 F.2d 1, 3 (1st Cir.1985).

We agree with the SJC's analysis that a reasonable person in Tart's position would not have felt constrained during the initial questioning by the fisheries officer. At the time, Tart was on board his own vessel, docked at a pier open to public view, and simply was asked to produce documentation. There was no evidence that the three officers threatened Tart, restrained him, or otherwise engaged in any excessive show of force prior to their request to produce documentation. *See Ortega–Santana,* 869 F.2d at 14.

### III

### CONCLUSION

Although the habeas corpus petition was erroneously dismissed for failure to ex-

haust available state remedies, the district court correctly dismissed the first habeas claim discussed above, and properly denied the five remaining claims on the merits.

*Affirmed.*