## Nicholas A. PALMIGIANO, Petitioner-Appellant,

### v.

## Robert E. HOULE, Respondent-Appellee.

### No. 79–1372.

United States Court of Appeals, First Circuit.

Argued Jan. 9, 1980.

Decided April 8, 1980.

Judith Farris Bowman, by appointment of the Court, with whom Bowman & Bowman, Cambridge, Mass., was on brief, for petitioner-appellant.

John S. Foley, Sp. Asst. Atty. Gen., Providence, R. I., with whom Dennis J. Roberts, II, Atty. Gen., Providence, R. I., was on brief, for respondent-appellee.

---

Before COFFIN, Chief Judge, ALDRICH and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

This is an appeal from a denial, without an evidentiary hearing, of a petition for habeas corpus alleging state violations of petitioner's fourth amendment rights. The United States District Court for the District of Rhode Island held that *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), barred federal habeas corpus relief because petitioner's fourth amendment claims were fully litigated in the state courts of Rhode Island. Petitioner claims that there was no "full and fair litigation" within the meaning of *Stone v. Powell* because the Rhode Island Superior Court erroneously put the burden of proof on him as to the alleged fourth amendment violations at the state court post-trial habeas corpus hearing.

■ A brief exposition of the procedural background will help delineate the issues. After petitioner's warrantless and allegedly illegal arrest, a wound in his left wrist was medically examined, his fingerprints were taken, and four lineup identifications were made. All of this was used as evidence at his trial for robbery-murder.[1] Petitioner's appeal from his conviction did not raise any fourth amendment claims. After his conviction was affirmed,[2] a petition for habeas corpus based on alleged fourth amendment violations was filed with the Rhode Island Supreme Court, which denied it without prejudice and remanded to the Superior Court for an evidentiary hearing under Rhode Island's post-conviction relief statute.

At the evidentiary hearing, the state trial justice ruled that petitioner had the burden of proving his warrantless arrest lacked probable cause and that the entry of the police into the premises where he was arrested was not voluntary. In his opinion, the justice ruled as follows:

> It is elementary that in civil proceedings one who brings the complaint bears the burden of sustaining his allegations. Not only did the petitioner not sustain his allegations as to a lack of probable cause and Mrs. Salvatore's consent, the State presented more than ample evidence that there was probable cause and that voluntary consent to the entry was in fact given by Mrs. Salvatore.

The Rhode Island Supreme Court affirmed. *Palmigiano v. Mullen*, 377 A.2d 242 (R.I. 1977). It ruled that the trial justice erred in holding that petitioner had the burden of disproving consent,[3] but that the error did not require reversal because it did not prejudice petitioner. The Rhode Island Supreme Court focused on the above-quoted holding of the Superior Court justice and held:

> It is clear from this statement that even if he had determined that the state bore the burden of proof, he would still have concluded that the consent was voluntary and that the petitioner's arrest was legal. As a result, we conclude that the trial justice's misallocation of the burden of proof did not constitute reversible error.

*Id.* at 248.

The question of whether *Stone v. Powell* bars federal habeas corpus relief under these circumstances requires an examination of the totality of the state proceedings to determine whether they provided the

---

1. An illegal arrest not resulting in the seizure of evidence does not void a subsequent conviction. *Rose, Warden v. Mitchell and Nichols*, 443 U.S. 545, 576, 99 S.Ct. 2993, 3010, 61 L.Ed.2d 739 (1979) (Stewart, J., concurring in the judgment); *Gerstein v. Pugh*, 420 U.S. 103, 119, 95 S.Ct. 854, 865, 43 L.Ed.2d 54 (1975); *Frisbie v. Collins*, 342 U.S. 519, 522, 72 S.Ct. 509, 511, 96 L.Ed. 541 (1952).

2. *State v. Palmigiano*, 112 R.I. 348, 309 A.2d 855 (1973).

3. The Rhode Island Supreme Court cited *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1791, 20 L.Ed.2d 797 (1968), and *Leavitt v. Howard*, 462 F.2d 992, 995 (1st Cir.), *cert. denied*, 409 U.S. 884, 93 S.Ct. 175, 34 L.Ed.2d 140 (1972), for the rule that the burden of proving consent to a search is on the government.

petitioner the opportunity fully and fairly to litigate his fourth amendment claims. *Pignone v. Sands*, 589 F.2d 76, 79 (1st Cir. 1978).

We start first with the facts as gleaned from the record of the state habeas corpus proceeding. On April 10, 1969, a Brinks armored truck was robbed at the plant of H. P. Hood & Sons in Providence, Rhode Island, and one of the guards was shot during the robbery. After arriving at the scene, the police interrogated witnesses and obtained the following information. One of the Brinks guards shot at the robber and thought he wounded him. The robbery was carried out by a man wearing a woman's wig, gloves, eye glasses, and women's shoes. The robber dropped the money and discarded the disguise as he fled from the scene. Blood drippings were found in a warehouse adjacent to the plant along with parts of the disguise. One of the witnesses saw a man disguised as a woman go into an alley near the scene carrying a black suitcase and emerge a short time later driving a yellow station wagon. The description given by this witness included height, build, complexion and hair, all of which fitted petitioner. The station wagon, which was found abandoned not far from where petitioner lived, had bloodstains in it. It had been stolen from a company adjacent to H. P. Hood & Sons.

Two members of the Providence Police Department, Eddy and O'Connell, were told by an informant in June of 1968 that one Gerald Mastracchio had asked him and others to join in a holdup of a Brinks armored car at or near the H. P. Hood plant. According to the informant, Mastracchio picked this location because he had observed the armored car pickup routine from a bridge that overlooked the plant. The informant also told the police that the robbery plans included the use of a costume.

Petitioner was known to the police as a companion of Mastracchio. Mastracchio was seen immediately prior to the robbery when he drove a motorcycle directly in front of the armored car, causing it to slow down. He was also observed parked in the vicinity of H. P. Hood & Sons talking to an unknown person at the time of the robbery. Petitioner and Mastracchio had been seen together on Mastracchio's motorcycle a few days prior to the robbery.

After questioning the witnesses at the scene, the police sent out an order to pick up Mastracchio for questioning. On learning that a yellow station wagon had been found abandoned near where petitioner lived, the police began a search for petitioner. Mastracchio was soon picked up and, with him in custody, the police went to petitioner's home but failed to find him. They were then informed by a person described at the hearing as a "reliable informant" that petitioner had been seen entering the apartment of his aunt, Mrs. Barbara Salvatore. Petitioner was known to have lived there from time to time. In fact, Mrs. Salvatore characterized her apartment as petitioner's second home.

Between five and ten policemen went to the Salvatore apartment. No arrest warrant had been obtained for petitioner. The officers knocked at the door and one of them said, "Open up, we know he's there" or words to that effect. One of the officers testified that, since the door was hung with its hinges on the outside, he and another officer started to take the door off the hinges. There was testimony by another officer that no attempt was actually made to unhinge the door, but it was discussed. In any event, the door was opened shortly by Mrs. Salvatore, and the police entered the apartment and arrested petitioner. Officer O'Connell testified that Mrs. Salvatore was hysterical with fear when she opened the door and said, "Be careful, my two kids are in the room." According to O'Connell, when petitioner appeared, Mastracchio, who was still with the police, yelled at him, "They want you. They don't want me." Officer Lawton testified that when Mrs. Salvatore opened the door she said, "He's in the bedroom with the children. Be careful."

Mrs. Salvatore testified at the hearing to the following effect. When petitioner came to the apartment, he was hurt in one of his

wrists; she did not remember whether it was his left or right one. He said he wanted to wash his arm off and she told him to use peroxide. She was in the process of taking some garbage out into the hallway when she heard a rumbling in the hallway, so she looked out a window and saw "cops with guns pointing at the window." She did not know why the police were there. Then there was a banging at the door. She told the petitioner that "it was all cops outside." She heard the police say, "Don't shoot. I heard kids crying." She then heard someone else say, "Go get a hatchet. We will break it down." When she heard this, she opened the door and the police came into the apartment. She did not hear any talk about the door being removed from the hinges.

Later in the morning Mrs. Salvatore gave a signed statement to Officer Fuina in which she said that she gave her consent to the police to search her apartment. In the statement, she said that, after petitioner had arrived at her apartment, she received a telephone call from a sister-in-law who told her about the robbery and that a guard had been shot. The sister-in-law then said that she hoped that petitioner was not involved. There was nothing in the statement about hearing the police say they were going to get a hatchet and break the door down. The statement does, however, contain the following: Mrs. Salvatore heard the police knocking on the door downstairs. She told petitioner that she was going to open the door, whereupon he said, "Don't open the door." She replied, "I have to. They are going to break the door."

After receiving briefs from the parties, the state trial justice, in a comprehensive opinion, made specific findings and rulings. He found probable cause to arrest and exigent circumstances. In finding that the consent for entrance into the premises was voluntary, the trial court stated:

The Court discounts Mrs. Salvatore's testimony that she opened the door for the police because she believed that they were going to break the door down. She testified that she heard one of them say, "Get a hatchet—we'll chop the door down." On the contrary, the only reasonable inference which can be drawn from the credible evidence is that she opened the door voluntarily and allowed the police to enter. This fact is borne out by the evidence that she knew about the killing; that her sister-in-law hoped that the petitioner hadn't been involved; that the petitioner had arrived at her apartment shortly before the call with blood coming from his hand or wrist; that he was carrying an operating police radio; that Palmigiano had answered that he had "a little trouble" when she questioned him about his wounds; that the petitioner did not leave when she asked him to do so; and that she had children in the apartment. Whether or not she was concerned about the possibility of shooting by the police or the petitioner, or the possibility of her being charged with harboring does not appear in the record. The Court is satisfied that, in any event, she voluntarily admitted the police. The fact that she may have been fearful because of the circumstances with which she was faced does not negate the voluntariness of her consent to the police entry.[4]

The Rhode Island Supreme Court reviewed all of the issues, which included the question of standing as well as probable cause and whether the consent was voluntary or coerced. After reviewing the record of the hearing, it found:

The petitioner has failed to persuade us that the trial justice's findings and the inferences which he drew from the evi-

4. This finding contains more information about what went on in the Salvatore apartment prior to the arrival of the police than is shown in the record of the habeas corpus proceeding. At the habeas corpus proceeding, Mrs. Salvatore's statement was admitted in evidence, but it has not been included in the materials furnished to

us. We assume that the trial court's findings as to what went on in the Salvatore apartment are based on what was contained in her statement. While petitioner objects to the conclusions reached by the state trial court, he does not contend that the findings are at variance with the evidence.

dence are clearly wrong. Consequently we conclude that Mrs. Salvatore voluntarily consented to the entry by police into her apartment, and therefore their entry was lawful.

*Palmigiano v. Mullen,* 377 A.2d at 247. Because of its finding of voluntary consent, the court did not reach the issue of exigent circumstances.

The basic issue is whether the misallocation of the burden of proof denied petitioner a full and fair opportunity to litigate his fourth amendment claims. *Stone v. Powell,* 428 U.S. at 494, 96 S.Ct. at 3052. As Mr. Justice Marshall noted in *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), federal courts, although relieved by *Stone* from holding evidentiary hearings and making the constitutional decisions in state fourth amendment cases, still have to struggle with the meaning and application of "an opportunity for full and fair litigation." *Id.* at 404–05 n.2, 98 S.Ct. at 2420 n.2. (Marshall, J., concurring). Although the struggle has not been long, it has been intense. Fortunately, a discernible set of guidelines is beginning to emerge from the cases.

Any analysis must start with the backhanded reference to *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), in *Stone,* 428 U.S. at page 494 n.36, 96 S.Ct. at 3052 n.36. The signal to the footnote comes in midsentence:

> In sum, we conclude that where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim,[36] a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

The footnote itself reads: "Cf. *Townsend v. Sain,* 372 U.S. 293 [, 83 S.Ct. 745, 9 L.Ed.2d 770] (1963)."[5]

We agree with those courts that have held that *Stone* does not incorporate the teaching of *Townsend* writ large. We think that the six-part test[6] of *Townsend* must be filtered through the holding and rationale of *Stone* before it can be applied to state court fourth amendment proceedings. As pointed out by the Fifth Circuit in *O'Berry v. Wainwright,* 546 F.2d 1204 (5th Cir.), *cert. denied,* 433 U.S. 911, 97 S.Ct. 2981, 53 L.Ed.2d 1096 (1977):

> Although the court in *Stone* stopped short of saying that its decision was a limitation on federal court jurisdiction, see *Stone, supra,* 428 U.S. at 494 n.37, 96 S.Ct. at 3052 n.37, 49 L.Ed.2d at 1088 n.37, the effect of finding full and fair consideration by the state courts of petitioner's Fourth Amendment claims is to prevent the exercise of federal court power altogether—a much more drastic result than that which is the result of the verbally similar finding made by a federal court under the *Townsend* formula.

*Id.* at 1211. The courts have emphasized that all that *Stone* requires is "an *opportunity* for full and fair litigation of a Fourth Amendment claim . . . ." 428 U.S. at 494, 96 S.Ct. at 3052 (emphasis added). *E. g., Gamble v. Oklahoma,* 583 F.2d 1161, 1164–65 (10th Cir. 1978). The Second Circuit has held that the opportunity limitation of *Stone* effectively overrules *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), with respect to fourth amendment exclusionary claims. *Gates v. Henderson,* 568 F.2d 830, 838 (2d Cir. 1977), *cert. denied,* 434 U.S. 1038, 98 S.Ct. 775, 54 L.Ed.2d 787 (1978).

---

5. *Cf.* means that the "cited authority supports a proposition different from that in text, but sufficiently analogous to lend support." A Uniform System of Citation 7 (12th ed. 1976).

6. "We hold that a federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing." *Townsend v. Sain,* 372 U.S. 293, 313, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963).

The conclusion we reach is that, while the criteria set forth in *Townsend* can be used as a guide in determining whether there has been full and fair state litigation of fourth amendment claims, they are not commandments the breaking of any of which absolutely requires an evidentiary hearing in the federal court. *Stone* does not, in contrast to *Townsend*, focus on the potential for error in the state court proceedings. *Stone*'s focus is on the utility of the exclusionary rule and the costs of extending it to collateral review of fourth amendment claims. 428 U.S. at 489, 96 S.Ct. at 3050. *Stone* emphasizes the integrity of the state court proceedings and assumes that the state courts will be as diligent as the federal courts in protecting fourth amendment rights. *Id.* at 493–94 n.35, 96 S.Ct. at 3052 n.35.

There are some specific rules emerging from the furrow ploughed by *Stone* that bear upon the instant case. In *Pignone v. Sands*, 589 F.2d at 80, there were two separate court hearings on appellant's fourth amendment claim and two separate appeals. Even though both trial court hearings were decided on the basis of incorrect legal principles, we found that an opportunity for full and fair state court litigation had in fact been provided since the final appellate decision was in accord with applicable law.

A state court's decision not to hold an evidentiary hearing on a motion to suppress because the affidavits of the petitioner did not conflict with those of the police officers was held to meet the full and fair litigation test of *Stone*. *Mack v. Cupp*, 564 F.2d 898, 901 (9th Cir. 1977).

██ A routine credibility determination by the state trial court cannot be attacked in the federal court. *United States ex rel. Petillo v. New Jersey*, 562 F.2d 903, 907 (3d Cir. 1977).

██ An error in the state court's decision is not a denial of full and fair litigation. *Dupont v. Hall*, 555 F.2d 15, 17 (1st Cir. 1977). *See also United States ex rel. Maxey v. Morris*, 591 F.2d 386, 389 (7th Cir. 1979), holding that *Stone* bars review on grounds that "the federal courts would decide the issue differently."

In *Swicegood v. Alabama*, 577 F.2d 1322 (5th Cir. 1978), the Fifth Circuit was faced with fourth amendment violation claims spawned by an allegedly illegal arrest. The court flatly rejected appellant's argument that he did not receive full and fair consideration because the state court dealt with the illegal arrest question only "in passing" and because the state court misapplied settled principles of constitutional law. The court stated, "If we were to accept these arguments, *Stone* would be rendered meaningless." *Id.* at 1324.

██ With this as background, we now turn to the specific claims of petitioner. He urges that the erroneous allocation of the burden of proof so distorted the trial court's fact-finding process as to deprive him of a full and fair hearing. Petitioner also argues that the review by the Rhode Island Supreme Court was skewed because it only read the record with an eye to determining whether the trial court's findings were clearly erroneous and, therefore, it could not have made an independent assessment of the facts. The distortion of the fact-finding process was magnified, according to petitioner, because the trial court's ruling on the burden of proof prevented him from cross-examining the police witnesses.

Our examination of the state court record fails to reveal any distortion. Petitioner has not pointed to any specific questions or line of questions that his counsel was prevented from asking. We note that leading questions were asked without objection by the state. Regardless of the allocation of the burden of proof, all of the facts bearing on probable cause and the entry into the Salvatore apartment were adduced at the hearing. Petitioner does not complain that he was prevented from producing or obtaining relevant evidence. What petitioner really objects to are the findings of the trial court. The critical and close question of whether Mrs. Salvatore voluntarily consented to the police entry hinged on the trial justice's assessment of her credibility. This credibility finding could be in no way influ-

enced by who had the burden of proof. Mrs. Salvatore testified fully at the hearing. After her direct testimony, she was confronted with and cross-examined about her signed statement. The state court had the right to consider the testimony of the police on this issue also, something petitioner overlooks. Petitioner argues in his brief that the trial court's failure to refer to or analyze the testimony of the two principal arresting officers that forcible entry was discussed and in fact attempted requires the conclusion that voluntary consent was not supported by the evidence. Aside from the fact that this is a distortion of the evidence, we cannot substitute our judgment for that of the state court. *See United States ex rel. Maxey v. Morris*, 591 F.2d at 389; *Dupont v. Hall*, 555 F.2d at 17. We agree with the Supreme Court of Rhode Island that credibility was for the trial justice.

We also reject petitioner's attack on the review process of the Rhode Island Supreme Court. Its opinion shows that it reviewed the record carefully. We agree with it that the language of the trial court indicates that the allocation of the burden of proof did not dictate the trial court's finding of probable cause and voluntary consent. If the trial justice had stated only that petitioner had not met his burden of proof of sustaining the allegations, the Rhode Island Supreme Court might have acted differently and, if it had not, we would have a different case. But he went on to say:

> Not only did the petitioner not sustain his allegations as to a lack of probable cause and Mrs. Salvatore's consent, the State presented more than ample evidence that there was probable cause and that voluntary consent to the entry was in fact given by Mrs. Salvatore.

This means to us, as it did to the Rhode Island Supreme Court, that the burden of proof allocation was not a factor in the trial court's findings. The Supreme Court's review process was, therefore, not slanted unfairly because it viewed the facts from the clearly erroneous perspective, which was the correct standard. This is not a case of an improper jury instruction on the burden of proof, where it cannot be determined that the jury's decision was not infected thereby. *Gorin v. United States*, 313 F.2d 641, 654 (1st Cir. 1963).

We conclude that petitioner was afforded a full and fair hearing on his fourth amendment claims in the state courts of Rhode Island. This makes it unnecessary for us to determine whether the Rhode Island Supreme Court's ruling that the misallocation of the burden of proof did not prejudice defendant and, therefore, did not constitute reversible error comports with *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

*Affirmed.*