# United States Court of Appeals
## For the First Circuit

No. 01-1008

MICHAEL J.F. SANNA,

Petitioner, Appellant,

v.

PAUL DIPAOLO,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Boudin, Chief Judge,

Torruella and Selya, Circuit Judges.

Donald A. Harwood for appellant.
William J. Meade, Assistant Attorney General, Commonwealth of Massachusetts, with whom Thomas F. Reilly, Attorney General, was on brief, for appellee.

September 10, 2001

**SELYA, Circuit Judge.** Petitioner-appellant Michael J.F. Sanna, a state prisoner, appeals from the denial of his application for habeas corpus. His arguments here mirror those that he unsuccessfully made below: that the Commonwealth failed to provide him a full and fair opportunity to litigate his Fourth Amendment claim, that the police violated his Miranda rights, and that the state trial court's failure properly to instruct the jury as to the effect of his possible intoxication deprived him of due process. In light of the special rules that the Supreme Court has established for collaterally reviewing claims of error involving the Fourth Amendment and the exclusionary rule, see Stone v. Powell, 428 U.S. 465, 481-82 (1976), and the strictures of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, we find the petitioner's plaints unpersuasive. Accordingly, we affirm the district court's denial of the writ.

## I. BACKGROUND

The facts underlying the petitioner's conviction for first-degree murder are extensively chronicled in the opinion of the Massachusetts Supreme Judicial Court (SJC), see Commonwealth v. Sanna, 674 N.E.2d 1067, 1070-71 (Mass. 1997), and we refer the reader who hungers for exegetic detail to that opinion. For present purposes, it suffices to sketch the events leading to

-3-

the petitioner's arrest and conviction (resolving conflicts in the evidence favorably to the state courts' findings), and thereafter limn the travel of the case.

## A. The Facts.

On October 12, 1991, Abington police officers entered the apartment of the petitioner's seventy-four year old great uncle, Mario diCicco, and found his body lying in a pool of blood. An autopsy revealed that diCicco had been stabbed thirty-four times and bludgeoned repeatedly with a blunt instrument. The police matched fingerprints found at the crime scene with those of the petitioner.

Two officers thereupon visited the residence of the petitioner's parents, not pausing to procure a warrant. When they arrived, the petitioner's father approached them, engaged in a brief interchange, and invited them into the house. Once inside, the officers spied the petitioner lying on a couch, covered by a blanket. One of the policemen removed the blanket and asked the petitioner to stand. After noticing cuts and scratches, the officers arrested the petitioner and read him his Miranda rights. See Miranda v. Arizona, 384 U.S. 436, 444-45 (1966). The petitioner vouchsafed his understanding of those rights.

The officers then transported the petitioner to the Abington police station. They again explained his Miranda rights and inquired whether he wished to make a call. The petitioner demurred. Interrogation ensued and, within the next few hours, the petitioner admitted that he had killed diCicco. After recounting the details of the slaying, he told the officers for the first time that he had an attorney.[1] They immediately offered to contact the lawyer, but the petitioner refused the offer. The police then secured a warrant to search the petitioner's home and automobile. The search revealed additional inculpatory evidence.

## B. **The Travel of the Case.**

Following his indictment, the petitioner filed motions to suppress both his incriminating statements and the physical evidence garnered as a result of the searches. A four-day evidentiary hearing ensued. Several months later, the state court judge handed down a closely reasoned rescript denying the motions to suppress.

---

[1]This point was hotly disputed in the trial court. The petitioner's father testified that, as the police were escorting the petitioner to their unmarked car immediately after taking him into custody, he loudly asked his father to call his attorney. The officers denied having heard any such importuning, and the state court judge specifically found that the petitioner had not mentioned a lawyer until after he had confessed. See Sanna, 674 N.E.2d at 1070 n.5.

The petitioner's trial took place late in 1993. Under Massachusetts law, "[m]urder committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty, or in the commission or attempted commission of a crime punishable with death or imprisonment for life" can comprise first-degree murder. Mass. Gen. Laws ch. 265, § 1. The jury found the petitioner guilty of first-degree murder by reason of extreme atrocity and cruelty. The trial court sentenced him to life imprisonment. On direct review, the SJC affirmed. Sanna, 674 N.E.2d at 1071-74.

On January 9, 1998, the petitioner filed an application for a writ of habeas corpus under 28 U.S.C. § 2254. The respondent, a state correctional official, moved to dismiss on the ground, inter alia, that the application failed to limn a cognizable claim for federal habeas relief. On December 14, 2000, the district court, adopting a magistrate judge's report and recommendation, granted the motion to dismiss. The court thereafter issued a certificate of appealability covering the three issues to which we have alluded. See 28 U.S.C. § 2253(c)(1). This proceeding followed.

II. THE AEDPA STANDARD

In 1867, Congress authorized the federal courts to grant writs of habeas corpus at the behest of state prisoners

-6-

held in violation of either the United States Constitution or federal law. While the procedural framework for federal habeas relief has changed over time, the scope of the federal courts' jurisdiction has remained intact. Williams v. Taylor, 529 U.S. 362, 374-75 (2000). Recently, however, the Supreme Court has clarified that the incidence of constitutional error in a state criminal trial does not, in itself, justify federal habeas relief. See id. The AEDPA amendments, which took effect on April 24, 1996, elevated the importance of this principle and widened the area within which federal habeas courts must defer to state court decisions (whether or not erroneous). See O'Brien v. DuBois, 145 F.3d 16, 20 (1st Cir. 1998).

Two of the situations in which the AEDPA authorizes a federal court to grant habeas redress are pertinent here. One such situation arises when the underlying state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). This, in turn, provides two possible pathways to habeas relief. A federal court may ask whether there was an established Supreme Court precedent and grant relief if it determines that the state court's decision contravened that precedent. Williams v. Taylor, 529 U.S. at

-7-

376-78; Williams v. Matesanz, 230 F.3d 421, 424-25 (1st Cir. 2000); O'Brien, 145 F.3d at 24. If there is no Supreme Court case on point or if there is one and the state court correctly characterized it, the federal court nonetheless may grant the writ based upon a determination that the state tribunal applied the Supreme Court precedent in an unreasonable manner. Taylor, 529 U.S. at 376-78; Matesanz, 230 F.3d at 424-25; O'Brien, 145 F.3d at 24.

The AEDPA also allows collateral relief in a quite different situation: when a federal habeas court determines that a state court adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). It is worth noting, however, that these words cannot be read in a vacuum; they must be interpreted in conjunction with a companion subsection specifying that "a determination of a factual issue made by a State court shall be presumed to be correct," and that "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." Id. § 2254(e)(1); see also Coombs v. Maine, 202 F.3d 14, 18 (1st Cir. 2000) (discussing and applying these provisions). For this purpose, "facts" are defined as "basic, primary, or historical facts: facts in the sense of a

-8-

recital of external events and the credibility of their narrators." <u>Bryson</u> v. <u>Ward</u>, 187 F.3d 1193, 1211 (10th Cir. 1999) (citation and internal quotation marks omitted).

## III. ANALYSIS

The petitioner contends that his conviction is thrice tainted by constitutional error because (i) his warrantless arrest was unconstitutional, (ii) his <u>Miranda</u> rights were transgressed, and (iii) his due process rights were offended by the jury instructions on malice.[2] We address each of these contentions in turn.

### A. <u>The Fourth Amendment Claim</u>.

The petitioner's first argument — that the state court should have excluded the evidence (including his confession and the fruit of the subsequent searches of his home and car) that resulted from his warrantless arrest — falls into a special category. Federal habeas jurisdiction has distinct characteristics, and principles of finality, federalism, and comity inform its scope. <u>See</u> <u>Brecht</u> v. <u>Abrahamson</u>, 507 U.S. 619, 633-35 (1993); <u>Teague</u> v. <u>Lane</u>, 489 U.S. 288, 308-10 (1989).

---

[2]The petitioner raised another ground for habeas relief below — a ground that related to the prosecutor's allegedly improper summation. He does not repeat that argument here and, in all events, it is not among the issues listed in the certificate of appealability. Consequently, we deem that ground waived. <u>See</u> <u>Bui</u> v. <u>DiPaolo</u>, 170 F.3d 232, 236-37 (1st Cir. 1999).

In constructing this balance in respect to claims premised on violations of the Fourth Amendment, the Supreme Court has recognized that the prophylactic remedy for such violations typically available on direct review — the exclusion of the evidence derived, directly or indirectly, from the violation — is designed to deter law enforcement personnel from disregarding constitutional mandates. See Mapp v. Ohio, 367 U.S. 643, 658-59 (1961). The exclusionary rule is not without its vices, however; most notably, it too often results in keeping relevant, reliable information from the factfinder. Stone v. Powell, 428 U.S. 465, 489-90 (1976). The Stone Court reasoned that this cost far exceeds the marginal increase in deterrent effect that might result from extending the exclusionary rule to habeas proceedings. Id. at 493-95. The Court therefore concluded that,

> where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

Id. at 482.

Stone thus stands for the proposition that a federal habeas court ordinarily cannot revisit a state court's disposition of a prisoner's Fourth Amendment claims. Withal,

-10-

this proposition is not absolute: there is an exception for instances in which a habeas petitioner had no realistic opportunity to litigate his Fourth Amendment claim fully and fairly in the state system. Palmigiano v. Houle, 618 F.2d 877, 881-82 (1st Cir. 1980); Breest v. Helgemoe, 579 F.2d 95, 98 (1st Cir. 1978). This exception survives the passage of the AEDPA. See, e.g., Herrera v. LeMaster, 225 F.3d 1176, 1178 (10th Cir. 2000); Seymour v. Walker, 224 F.3d 542, 553 (6th Cir. 2000).

The petitioner asseverates that his case avoids the Stone bar because the Commonwealth deprived him of the opportunity for full and fair litigation of his Fourth Amendment claim. The district court rejected this asseveration, and we review de novo its holding that the state courts afforded the petitioner a sufficient opportunity to litigate his Fourth Amendment claim. See Miranda v. Cooper, 967 F.2d 392, 401 (10th Cir. 1992).

The petitioner bears the burden of proving that his case fits within the contours of the exception. See Palmigiano, 618 F.2d at 881-83. He cannot carry that burden here. In the state superior court, the petitioner filed two separate pretrial motions to suppress evidence harvested as the fruit of the alleged illegality. After allowing discovery and holding a four-day evidentiary hearing on the merits of the petitioner's

-11-

plaints, the superior court judge issued a reasoned opinion crediting the police officers' testimony and finding that the petitioner's father voluntarily invited the officers into his home. On direct appeal, the SJC pondered the petitioner's plea yet again and found it wanting. Sanna, 674 N.E.2d at 1072. In so holding, the court specifically rejected the petitioner's argument, based upon Payton v. New York, 445 U.S. 573, 583-603 (1980), that the officers tricked his father into consenting to the entry by failing to inform Mr. Sanna fully of their intention to arrest his son. Sanna, 674 N.E.2d at 1073. We hardly can imagine a more thorough set of procedures for the litigation of a Fourth Amendment claim — and the petitioner, represented by counsel throughout, took full advantage of them.

Faced with this obviously adequate procedural framework, the petitioner mounts a rather curious offensive. Instead of questioning the state process, he challenges the state court's factual findings. In his view, no reasonable factfinder could have concluded that his father consented to the officers' warrantless entry.

This challenge fails. Although a federal habeas court may inquire into the adequacy and fairness of available state court procedures for the adjudication of Fourth Amendment claims, its inquiry ordinarily ends upon a determination that

-12-

those procedures pass muster.  See Pignone v. Sands, 589 F.2d 76, 79 (1st Cir. 1978).  Put another way, "a full and fair opportunity" to litigate means that the state has made available to defendants a set of procedures suitably crafted to test for possible Fourth Amendment violations.  Id.  So long as a state prisoner has had an opportunity to litigate his Fourth Amendment claims by means of such a set of procedures, a federal habeas court lacks the authority, under Stone, to second-guess the accuracy of the state court's resolution of those claims.  See Caver v. Alabama, 577 F.2d 1188, 1192 (5th Cir. 1978) (holding habeas review precluded if state provides a suitable procedure for full and fair opportunity to litigate Fourth Amendment claims, regardless of whether the petitioner employs that procedure).  Hence, the mistaken outcome of a state court suppression hearing, standing alone, cannot be treated as a denial of the opportunity fully and fairly to litigate a Fourth Amendment claim (and, thus, cannot open the door to federal habeas review).  Willett v. Lockhart, 37 F.3d 1265, 1270 (8th Cir. 1994) (en banc); Palmigiano, 618 F.2d at 882; Pignone, 589 F.2d at 79; United States ex rel. Petillo v. New Jersey, 562 F.2d 903, 906 (3d Cir. 1977).

The petitioner endeavors to make two separate end runs around this doctrinal obstacle.  First, he attaches decretory

-13-

significance to a footnote (footnote 36) in which the Stone Court employed a "cf." citation to Townsend v. Sain, 372 U.S. 293 (1963). See Stone, 428 U.S. at 494 n.36. We do not gainsay that Townsend is an important precedent: it guides federal habeas courts in determining when it is necessary to hold evidentiary hearings in habeas cases. See Townsend, 372 U.S. at 315. Among other things, the requirement for such a hearing can be triggered when "the state factual determination is not fairly supported by the record as a whole." Id. at 313. But the case law clearly indicates that the Stone Court's subtle and indirect reference to Townsend does not serve to incorporate the Townsend standard into the Stone holding for all purposes. See Palmigiano, 618 F.2d at 881; O'Berry v. Wainwright, 546 F.2d 1204, 1212 (5th Cir. 1977). Indeed, the petitioner's broader reading of footnote 36 not only is unsupported by respectable authority but also would result in an exception capable of swallowing Stone in a single gulp. Accordingly, we hold that, notwithstanding footnote 36, a habeas petitioner cannot elude Stone where his sole complaint is that the outcome of a perfectly satisfactory state process was erroneous. See Willett, 37 F.3d at 1270.

The petitioner's second attempt to skirt Stone fares no better. The petitioner notes that, Stone notwithstanding,

-14-

there is some authority permitting a federal habeas court to hear a state prisoner's Fourth Amendment claim if the petitioner can show an irretrievable breakdown in the process provided by the state. See, e.g., Sweet v. Delo, 125 F.3d 1144, 1152 (8th Cir. 1997) (en banc); Gates v. Henderson, 568 F.2d 830, 840 (2d Cir. 1977). This is a sound rule — but it is a rule of last resort, to be applied sparingly. More to the point, it has no place in this case. The petitioner concedes the general efficacy of the procedures used by the Massachusetts courts to test the validity of Fourth Amendment claims, and does not suggest that those procedures were inoperative in his case. To cinch matters, the petitioner's insufficiency of the evidence claim, even on the dubious assumption that it has merit, surely does not constitute the type of egregious and unconscionable collapse in the machinery of adjudication which might warrant a federal habeas court in invoking the narrow irretrievable breakdown exception.

We have said enough on this score. Because the petitioner had — and exercised — an ample opportunity to litigate his Fourth Amendment claim fully and fairly in the state courts, the district court appropriately prohibited him from relitigating that claim in his federal habeas proceeding.

### B. The Miranda Claim.

-15-

The petitioner next challenges the state courts' conclusion that the police did not impermissibly disregard his invocation of the right to counsel. Broadly speaking, the Constitution dictates that when a person in police custody requests the presence of an attorney, the authorities must cease interrogation. Edwards v. Arizona, 451 U.S. 477, 484 (1978). At the suppression hearing, the petitioner's father claimed that the petitioner invoked this right, within the officers' earshot, by shouting to his father to call the petitioner's attorney. See supra note 1. The petitioner contends that the officers' decision to continue interrogating him after he had made this request violated Edwards.

We need not consider whether the petitioner's supposed shout amounted to an invocation of the right to counsel. At a bare minimum, an invocation of the right to counsel must be communicated by the suspect to the police — and the police officers who were escorting the petitioner at the critical time testified unequivocally that they never heard any such outcry. The state court judge credited this testimony, resolving the apparent credibility conflict in the officers' favor. Without more, the law requires us to presume that this factual finding is correct and to defer to it. See Parker v. Head, 244 F.3d 831, 837 (11th Cir. 2001) (citing 28 U.S.C. § 2254(e)(1)).

We say "without more" because a habeas petitioner can rebut this presumption by adducing "clear and convincing evidence," 28 U.S.C. § 2254(e)(1), and a federal habeas court will issue the writ if this proffer convinces it that the underlying state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). Here, however, the petitioner marshals no such showing. He simply insists that the officers' testimony was untrustworthy. That will not do.

Credibility is quintessentially a matter of fact, reserved in almost every circumstance for the trier. E.g., United States v. Alicea, 205 F.3d 480, 484 (1st Cir. 2000); Johnson v. Watts Regulator Co., 63 F.3d 1129, 1139 (1st Cir. 1995). In this instance, the state trial court spoke clearly, and the SJC resoundingly endorsed its credibility assessment. Sanna, 674 N.E.2d at 1073-74. Under these circumstances, it would be wholly inappropriate for a federal court to repastinate soil already thoroughly plowed and delve into the veracity of the witnesses on habeas review. See Seymour, 224 F.3d at 553; Caldwell v. Maloney, 159 F.3d 639, 650 (1st Cir. 1998); see also Coombs, 202 F.3d at 19 (deferring to the state appellate court's characterization of the trial court's credibility

-17-

determination).  Since the challenged factual finding was based upon a plausible credibility determination, we reject the petitioner's <u>Miranda</u> claim.

### C. **The Jury Instruction Claim**.

In order to convict for first-degree murder under Massachusetts law, the Commonwealth must prove the requisite mental state — malice aforethought — and show deliberate premeditation, extreme atrocity and cruelty, or felony murder. <u>See</u> Mass. Gen. Laws ch. 265, § 1 (quoted <u>supra</u> Part I(B)).  The Commonwealth can prove malice aforethought in any of three different ways:  by demonstrating (1) that the defendant specifically intended to kill the victim without justification or excuse, or (2) that the defendant intended to cause grievous bodily injury to the victim, or (3) that "in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow the contemplated act." <u>Commonwealth</u> v. <u>Grey</u>, 505 N.E.2d 171, 173 n.1 (Mass. 1987).  The third alternative differs importantly from the first two in that it calls for an objective rather than a subjective analysis under which the factfinder can infer malice aforethought without proof of specific intent.  <u>Id.</u>

In this case, there was some evidence that the petitioner had ingested cocaine on the day of the killing. The state trial court initially instructed the jury to consider this evidence in assessing deliberate premeditation, extreme atrocity, and specific intent.[3] The court refused, however, to instruct that evidence of intoxication might be relevant to whether the defendant possessed the level of understanding required to appreciate that death was a likely consequence of his actions.

After the jurors had deliberated for a few hours, they asked the court to clarify its mens rea instructions. The judge took the opportunity to deliver a supplemental instruction directing the jury to consider intoxication when evaluating whether a reasonably prudent person in the defendant's position would appreciate that death might result from his actions.[4] The

---

[3]The court charged the jurors to "consider evidence that the defendant was intoxicated from the voluntary use of drugs when you consider whether he deliberately premeditated." Later, in discussing extreme atrocity, the court admonished that "[i]f the evidence shows that the defendant had impaired capacity because of drugs at the time the crime was committed, you should consider what effect, if any, the defendant's impairment had on his ability to appreciate the consequences of his choices." The court added: "You may consider [whether the defendant was under the influence of drugs at the time] on the issue of whether the prosecution has proven that the defendant had specific intent to kill or grievously injure the victim beyond a reasonable doubt."

[4]The supplemental instruction reads in pertinent part: [I]f you find that there was an impairment

-19-

petitioner objected that this was too little, too late — and confusing to boot. The trial court overruled his objection. The petitioner argues here, as he did before the SJC and the court below, that the clumsy patchwork of instructions deprived him of due process by failing adequately to inform the jury about the relevance of his alleged intoxication to the third branch of "malice aforethought."

Federal habeas relief cannot be granted merely because a state court errs in its application of state law. E.g., Puleio v. Vose, 830 F.2d 1197, 1204 (1st Cir. 1987). But a state law or practice that betrays a fundamental principle of justice offends the Due Process Clause. Cooper v. Oklahoma, 517 U.S. 348, 363-65 (1996); Patterson v. New York, 432 U.S. 197, 201-02 (1977). Thus, a state court's error in applying a state rule sometimes can have constitutional implications. E.g., Chambers v. Mississippi, 410 U.S. 284, 294 (1973). That, in turn, may afford a basis for federal habeas relief.

---

of [the petitioner's] mental capacity caused by the ingestion of drugs, you are to consider that impaired mental capacity in determining what circumstances were known to the defendant as it relates to whether a reasonably prudent person would have known that there was a plain and strong likelihood that according to common experience death of the victim would follow those actions.

-20-

This is not to say that every error of state law can be transmogrified by artful argumentation into a constitutional violation. The Supreme Court has invoked the Chambers tenet only rarely, e.g., Crane v. Kentucky, 476 U.S. 683, 690-91 (1986) (considering the irrational exclusion, on state-law grounds, of highly relevant evidence critical to the defense), and its use is to be reserved for extreme cases, see Fortini v. Murphy, 257 F.3d 39, 45-46 (1st Cir. 2001).

The defendant in Montana v. Egelhoff, 518 U.S. 37 (1996), made such an assertion, maintaining that a Montana statute which prohibited the consideration of proof of voluntary intoxication in assessing mens rea deprived criminal defendants of due process. The Court rejected his assertion. See id. at 56 (plurality op.). Despite the fact that the Court was splintered, five Justices agreed that the right to have a jury weigh intoxication evidence in relation to criminal responsibility is not a fundamental principle of justice. Id. at 48.

In light of Egelhoff, it is difficult to imagine how the slightly off-kilter instructions here could betray a fundamental principle of justice. If a state can forbid jurors from considering intoxication evidence at all, it would be strange to think that an incomplete warning anent the effects of

intoxication, belatedly (if imperfectly) supplemented, could offend basic notions of fairness. We reject the suggestion.

The petitioner perseveres, insisting that Egelhoff does not answer the question of whether a state can determine that intoxication is relevant to criminal responsibility as a substantive matter and then fail to ensure that the jury is properly instructed to that effect. That is true as far as it goes, see Egelhoff, 518 U.S. at 58 (Ginsburg, J., concurring) (noting that a statute encounters "no constitutional shoal" as long as the law is conceived as substantively redefining mens rea), but it leads the petitioner down a blind alley. If Egelhoff is inapposite, the petitioner must show that the state court's decision is contrary to, or an unreasonable application of, some other firmly established Supreme Court precedent. See Matesanz, 230 F.3d at 425; see also 28 U.S.C. § 2254(d)(1).

In an effort to escape from this blind alley, the petitioner asserts that, although states enjoy wide latitude in defining both the elements of particular crimes and "the extent to which moral culpability should be a prerequisite to conviction of a crime," Powell v. Texas, 392 U.S. 514, 545 (1968), they cannot reallocate the burden of proof once they have set those elements in place. The petitioner correctly cites In re Winship, 397 U.S. 358, 364 (1970), as authority for

this proposition and, based on <u>Winship</u>, he claims that the faulty jury instruction violated due process because it impermissibly shifted the burden of proof by relaxing the Commonwealth's obligation to prove beyond a reasonable doubt that the petitioner possessed the requisite mental capacity for murder.

Noting that the <u>Egelhoff</u> Court rejected a substantially similar argument, 518 U.S. at 54-55, the Commonwealth takes the position that this thesis, too, should be rejected. Life is not that simple: there is a potentially important difference between Massachusetts state law and the Montana statute at issue in <u>Egelhoff</u>. In decreeing that criminal defendants are entitled to an instruction on intoxication vis-à-vis malice, Massachusetts, unlike Montana, has established that intoxication is <u>substantively</u> relevant to criminal responsibility. In this case, criminal responsibility — or malice aforethought — is an element of the crime and, as such, it must be proved beyond a reasonable doubt. Thus, an imperfect intoxication instruction might possibly reduce the government's burden of proof. It follows that <u>Egelhoff</u> affords no safe harbor for the Commonwealth.

Still, it is hard to see how the SJC's rejection of the petitioner's argument can be deemed contrary to, or an

-23-

unreasonable application of, Winship. Although the Winship Court's holding is clearly established, that holding operates at a high level of generality. This case lies somewhere on the blurry outskirts of Winship, rendering the case starkly inappropriate for treatment under the "contrary to" prong of section 2254(d)(1). In this regard, the "key inquiry . . . is whether a Supreme Court rule — by virtue of its factual similarity (though not necessarily identicality) or its distillation of general federal law precepts into a channeled mode of analysis specifically intended for application to variant factual situations — can fairly be said to require a particular result in a particular case." O'Brien, 145 F.3d at 25. Viewed through this prism, there is no principled way to conclude that Winship unarguably demands a finding that due process was violated here. See Taylor, 529 U.S. at 406 (explaining that a state court decision which applies the correct legal rule to reach an independent outcome on different facts cannot be deemed to transgress the "contrary to" branch of section 2254(d)(1)).

Nor can the SJC's disposition of the appeal be considered an unreasonable application of Winship. Federal courts are not free to grant habeas relief simply because they disagree with the outcome of a state's adjudication. Taylor,

529 U.S. at 375. Rather, "for the writ to issue, the state court decision must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible options." O'Brien, 145 F.3d at 25. The failure to distill the nuanced, case-specific rule urged by the petitioner — that the imperfect intoxication instruction impermissibly shifted the burden of proof anent mental capacity — from the Winship Court's more general holding does not come close to fitting this mold. See Matesanz, 230 F.3d at 426 (explaining that where reasoned application of clearly established Supreme Court precedent to a particular set of facts can lead to more than one plausible outcome, "the state court's choice between those . . . outcomes, whether right or wrong, cannot constitute a basis for habeas relief under the second branch of section 2254(d)(1)"); see also Hurtado v. Tucker, 245 F.3d 7, 20 (1st Cir. 2001) (counseling caution in the use of the "unreasonable application" branch of section 2254(d)(1)).

The sockdolager is that, regardless of the constitutionality of the jury instruction, the SJC rejected the petitioner's claim on the ground that any instructional error

(whether or not of constitutional magnitude) was harmless.[5] Sanna, 674 N.E.2d at 1074-76. In reaching that conclusion, it noted that the linchpin of the petitioner's defense was his claim that someone else committed the crime. Id. at 1073. Although the petitioner testified that he was "fogged out" from smoking crack cocaine on the day of the murder, the SJC believed that his overall testimony indicated quite plainly that he was fully aware of the circumstances that existed before and after the crime. Id. What is more, he eschewed any description of his state of mind at the time he was in his great-uncle's apartment. Id. Weighing these facts, the SJC reasoned that the nature of the petitioner's defense, coupled with the palliative effect of the supplemental instruction, rendered any error harmless. Id. at 1075-76. In the court's view, "[w]here no evidence exists that the defendant did not have knowledge of the circumstances of the killing, an error in the instruction on the effect of intoxication on the defendant's knowledge does not constitute reversible error." Id. at 1075.

---

[5]The SJC did not squarely decide whether the intoxication instructions violated state law. Since an error in state law is a condition precedent to a claim that the burden of proof shifted, there could be no Winship violation in the absence of such an error. This would be an adequate and independent state ground barring federal habeas review. See Coleman v. Thompson, 501 U.S. 722, 729-31 (1991); Martin v. Hunter's Lessee, 14 U.S. (1 Wheat.) 304, 352-54 (1816).

-26-

Assuming, arguendo, that the state tribunal committed a cognizable constitutional error, we are constrained in the circumstances at hand to concur with the SJC's holding that any such error was harmless. While the Supreme Court has identified a small class of so-called "structural" errors that should never be deemed harmless, see Arizona v. Fulminante, 499 U.S. 279, 309-10 (1991), the instructional error here is not structural, see Neder v. United States, 527 U.S. 1, 8-15 (1999) (holding that the omission of an element of an offense from a jury instruction is not structural error and is, therefore, amenable to harmless error analysis); Sustache-Rivera v. United States, 221 F.3d 8, 17 (1st Cir. 2000) (similar). Accordingly, the bevue is subject to constitutional harmless error analysis.

On direct appeal, a court confronted by a preserved constitutional error must set aside the judgment unless it is satisfied that the error was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 24 (1967). Prior to the enactment of the AEDPA, a different, less exacting standard applied on collateral review. Under that standard, a federal habeas court was bound to uphold a state court judgment, notwithstanding a preserved constitutional error, as long as the error did not have a substantial, injurious effect on the jury's verdict. Brecht, 507 U.S. at 638. Although there is some

-27-

disagreement as to whether the <u>Brecht</u> standard survives the passage of the AEDPA, <u>see</u> <u>Hernandez</u> v. <u>Johnson</u>, 248 F.3d 344, 379 (5th Cir. 2001) (discussing opposing viewpoints and citing cases), we have consistently employed <u>Brecht</u> in cases arising under the AEDPA, <u>e.g.</u>, <u>Fortini</u>, 247 F.3d at 48-49; <u>Sustache-Rivera</u>, 221 F.3d at 18. We reaffirm that praxis today and hold that the <u>Brecht</u> standard applies in conjunction with the AEDPA amendments.[6]

Employing the <u>Brecht</u> standard, we conclude that the intoxication instructions here had neither a substantial nor injurious influence on the jury verdict. At trial, the petitioner premised his defense on a claim of mistaken identity. He offered virtually no evidence pertaining to the third strain of malice aforethought. Given the nature of the petitioner's defense and the fact that the original (imperfect) instructions were largely remedied by the court's supplemental charge, it is

---

[6]There is also some controversy about whether a federal habeas court should apply <u>Brecht</u> when the state court did not use the <u>Chapman</u> benchmark in its harmless error analysis. <u>Compare</u> <u>Tyson</u> v. <u>Trigg</u>, 50 F.3d 436, 446-47 (7th Cir. 1995) (applying <u>Brecht</u> to all cases on collateral review), <u>with</u> <u>Orndorff</u> v. <u>Lockhart</u>, 998 F.2d 1426, 1430 (8th Cir. 1993) (applying <u>Brecht</u> only when the state court has used the <u>Chapman</u> standard); <u>see</u> <u>generally</u> <u>Fortini</u>, 257 F.3d at 48 (discussing circuit split but taking no formal position on it). Here, however, the SJC, while not explicitly invoking <u>Chapman</u>, applied an essentially equivalent standard. <u>See</u> <u>Sanna</u>, 674 N.E.2d at 1075. <u>Brecht</u> therefore controls.

highly unlikely that the challenged instructions had the slightest impact on the jury's deliberations. Certainly, they could not have had a "substantial and injurious effect or influence," Brecht, 507 U.S. at 638, on the jury's evaluation of mens rea. It follows that there is no basis for federal habeas relief.

To recapitulate, the SJC's refusal to set aside the petitioner's conviction by reason of the challenged jury instructions was not contrary to, and did not involve an unreasonable application of established Supreme Court precedent. Under the AEDPA standard of review, the instructions did not violate the Due Process Clause either by betraying fundamental principles of justice or by shifting the burden of proof. To cinch matters, even if we could detect a whiff of cognizable constitutional error, that error would be deemed harmless under Brecht, 507 U.S. at 638.

## IV. CONCLUSION

We need go no further. Even before the passage of the AEDPA, the Supreme Court admonished that "[t]he role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited." Id. at 633. In particular, federal courts should not allow themselves to be used as vehicles for religitating state trials.

<u>Id.</u>  The parameters for granting habeas relief historically have been quite narrow, and the AEDPA standard of review circumscribed those parameters even further.  Here, any errors which may have marred the petitioner's trial were not sufficient to warrant federal habeas relief under these criteria.

**<u>Affirmed</u>.**